EDMUND LACHANCE *vs.* COMMISSIONER OF CORRECTION
& others.[1]

Essex. May 8, 2012. - November 27, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Imprisonment,* Segregated confinement, Reclassification hearing. *Due Process of Law,* Prison classification proceedings. *Constitutional Law,* Imprisonment. *Governmental Immunity.*

The ten-month detention of the plaintiff State prison inmate in a special management unit (unit) on awaiting action status, in light of the restrictive conditions to which he was subjected in the unit (particularly in comparison with the conditions of inmates housed in the general population unit in which the inmate had previously resided) exceeded the bounds of reasonable confinement in administrative segregation and gave rise to a liberty interest that was entitled to the protection of due process; further, the procedures followed by the Department of Correction were insufficient to safeguard that interest from abuse. [773-776]

Statement that a State prison inmate confined to administrative segregation on awaiting action status, whether such confinement occurs in an area designated as a special management unit, departmental segregation unit, or otherwise, is entitled as a matter of due process to notice of the basis on which he is so detained, a hearing at which he may contest the asserted rationale for his confinement, and a posthearing written notice explaining the reviewing authority's classification decision; further, this court concluded that in no circumstances may an inmate be held in segregated confinement on awaiting action status for longer than ninety days without a hearing. [776-777]

In a civil action brought by a State prison inmate arising from his ten-month detention in administrative segregation on awaiting action status, the defendant prison officials were entitled to summary judgment on the grounds that the plaintiff's claims for damages against them personally were barred by the doctrine of qualified immunity, where it would not have been clear to reasonable officials at the time when the alleged violations occurred that their behavior violated the plaintiff's right to due process. [777-778]

CIVIL ACTION commenced in the Superior Court Department on June 20, 2006.

[1]Additional defendants, sued in their individual capacities or in their official capacities, or both, include the superintendent of the Souza-Baranowski Correctional Center (SBCC), the former assistant director of classification of the SBCC, and the deputy superintendent for classification of the SBCC.

The case was heard by *Thomas R. Murtagh*, J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*William D. Saltzman* for the defendants.

*Bonita Tenneriello* (*James Pingeon* with her) for the plaintiff.

*Amy Fettig*, of the District of Columbia, *Matthew R. Segal, & John Reinstein*, for American Civil Liberties Union of Massachusetts & another, amici curiae, submitted a brief.

DUFFLY, J. The plaintiff, Edmund LaChance, is an inmate at the Souza-Baranowski Correctional Center (SBCC) in Shirley. From January to November, 2006, LaChance was held in administrative segregation in the SBCC special management unit (SMU) on awaiting action status, as prison officials sought his transfer or reclassification. During that time, his detainment was given the periodic, informal review provided by the Department of Correction (DOC) regulations that govern detention of inmates in an SMU. Claiming that he was entitled to the review procedures provided by regulation to inmates housed in a departmental segregation unit (DSU), LaChance brought suit alleging violations of his constitutional due process rights and of various State statutes and regulations, and seeking declaratory and injunctive relief as well as money damages. After the parties filed cross motions for summary judgment, a judge in the Superior Court granted LaChance's partial motion, ruling that the defendants had violated his right to due process under the State and Federal Constitutions. The judge denied the defendants' cross motion, insofar as it sought to dismiss LaChance's claims as barred under the doctrine of qualified immunity for public officials, and their motion for reconsideration.[2] The defendants appealed, and we transferred the case from the Appeals Court on our own motion.[3]

---

[2] We acknowledge the amicus brief of the American Civil Liberties Union of Massachusetts and the American Civil Liberties Union National Prison Project.

[3] The defendants' interlocutory appeal from the denial of their cross motion for summary judgment was proper under the doctrine of present execution. See *Littles* v. *Commissioner of Correction*, 444 Mass. 871, 875 (2005), and cases cited. See generally *Maxwell* v. *AIG Domestic Claims, Inc.*, 460 Mass. 91, 97-98 (2011), and cases cited.

We conclude that LaChance's ten-month administrative segregation in the SMU on awaiting action status, during which he had the benefit of only informal status reviews, was unlawful. We conclude also, however, that the law in this regard was not clearly established at the time of the underlying events, and that, with respect to LaChance's claim for damages, the defendants therefore are entitled to summary judgment, on the basis of qualified immunity.

*Background.* The relevant underlying facts set forth in the summary judgment record are not in dispute. Beginning in July, 2004, LaChance resided in J-1, a protective custody housing unit at SBCC. On December 21, 2005, he received a disciplinary report for throwing a cup of pudding at a fellow inmate and was referred to the SMU pending disciplinary proceedings.[4] Following a hearing on December 22, LaChance was assigned seven days' detention in the SMU as a sanction for the altercation. After learning of the sanction, he allegedly threatened to commit violence against the other inmate; for that infraction, he was assigned an additional seven days' disciplinary detention in the SMU, ending January 5, 2006.

For more than ten months after his disciplinary detention ended, LaChance remained in the SMU on awaiting action status.[5,6] During that period, a prison official reviewed LaChance's status

[4]The Department of Correction (DOC) defines a special management unit (SMU) as "[a] separate housing area from general population within institutions in which inmates may be confined for reasons of administrative segregation, protective custody, or disciplinary detention." 103 Code Mass. Regs. § 423.06 (2007). Administrative segregation is a "temporary form of segregation from general population used when the continued presence of the inmate in the general population would pose a serious threat to life, property, self, staff or other inmates, or to the security or orderly running of the institution." *Id.* Inmates who may be subject to administrative segregation include those held "pending investigation for a disciplinary . . . offense or pending transfer." *Id.* See 103 Code Mass. Regs. § 423.08(1) (2007).

[5]"Awaiting action" is not defined in the SMU regulations, 103 Code Mass. Regs. §§ 423.00 (2007); indeed, the phrase "awaiting action" does not appear therein. However, two other chapters of departmental regulations do address the meaning of "awaiting action" in specific contexts. First, the departmental segregation unit (DSU) regulations define "Awaiting Action in Restrictive Confinement," including confinement in the following context, as:

"A restricted area or areas designated by a superintendent or by the Commissioner in which an inmate who has been referred to the DSU

on a weekly basis, consistent with SMU regulations,[7] and written notifications given to LaChance after each review reflected that the rationale for his detainment in the SMU occasionally changed as a result of this informal review process.[8] He was returned to

> Board or is awaiting a final transfer decision by the Commissioner regarding placement in DSU may be confined. An inmate who has been classified to a DSU but is awaiting placement in a DSU may also be temporarily housed in this area."

103 Code Mass. Regs. § 421.06 (1994). Additionally, the regulation governing inmate discipline regulates the use of awaiting action status for inmates who are "under investigation for a possible disciplinary offense or [have] been charged with or found guilty of a disciplinary offense." 103 Code Mass. Regs. § 430.21(1) (2006). The regulation states, "Awaiting Action confinement includes any conditions which restrict the inmate from the general population of the institution." *Id.*

[6]The defendants claim that they attempted to find a secure placement for LaChance, after concluding that he could not be returned to the J-1 unit while the other inmate continued to reside there. As stated in two affidavits by the SBCC's superintendent on April 10, 2006, and November 22, 2006 — the former having been filed in connection with an unrelated action commenced by LaChance in 2004 — prison officials believed they had limited options with respect to LaChance's placement in the correctional system. These asserted limitations resulted from LaChance's classification as a maximum security inmate, which SBCC officials viewed as imperative; his need for protective custody; and the fact that LaChance had a history of abusive conduct toward correctional personnel and fellow inmates that made other institutions reluctant to accept him.

[7]"The status of each inmate placed in a special management unit on administrative segregation . . . status should initially be reviewed by the superintendent or designee within 72 hours of placement. Thereafter, each inmate's status should be reviewed every seven days for the first two months and at least every 30 days thereafter by a classification committee or other authorized group." 103 Code Mass. Regs. § 423.08(2)(b) (2007).

[8]These weekly notifications provided to LaChance, which were included in the summary judgment record, reflect the following:

> From December 22, 2005, through January 5, 2006, the term of his disciplinary sanction, he was held pending the disciplinary process.
>
> From January 12 through February 2, he was held awaiting reclassification.
>
> From February 9 through March 30, he was held "pending [a] classification decision" as officials sought to transfer him to an out-of-State facility.
>
> From April 6 through August 24, he was held pending placement in an out-of-State facility.

the J-1 unit in November, 2006, after the inmate at whom he had thrown the pudding had been moved out of it.

Throughout his confinement in the SMU, LaChance was held in conditions substantially more restrictive than those he had experienced in the J-1 housing unit. Residents of J-1 were allowed to spend almost five hours outside of their cells each day, during which they could engage in recreation in a variety of indoor and (sheltered) outdoor facilities; they were permitted three weekly "contact" visits, each lasting up to two and one-half hours; they had opportunities to visit the prison library according to a posted schedule; they were allowed to spend up to fifty dollars per week in the canteen, including on food items; and they had access to a broad range of educational, religious, and other programs.

In the SMU, by contrast, LaChance was allowed one hour of recreation each day, five days a week, in an unsheltered, outdoor cage; each week he was allowed to have two "non-contact" visits, each lasting no more than one hour; his library privileges were limited to requesting two books for delivery to his cell on a weekly basis, along with occasional access to a "satellite" law library; he was allowed to spend a maximum of twenty dollars per week in the prison canteen, on specified, nonfood items only; and he was unable to participate in educational, religious, vocational, or rehabilitative programming available to general population inmates. Additionally, unlike inmates in general population, his wrists and ankles were shackled at all times that he was outside his cell.

The present action commenced when LaChance filed a pro se complaint on June 20, 2006, five months into his confinement in the SMU.[9] In June, 2007, a judge in the Superior Court

From August 31 through November 9, he was again held pending a classification decision, after officials had determined he could not be placed in an out-of-State facility.

On November 15, he was returned to the J-1 housing unit at SBCC.

[9]LaChance also had filed an inmate grievance on January 11, 2006, seeking the return of legal documents that were seized from his J-1 cell at the time of his referral to the SMU. That request was denied, and he appealed to the superintendent, alleging that the proceedings against him were retaliatory in nature. The superintendent rejected his appeal on April 24.

denied the defendants' motion to dismiss and denied the parties' cross motions for summary judgment, stating that there remained issues of material fact that could not be resolved on the record before him. LaChance obtained representation by counsel and filed an amended complaint, in which he claimed that by depriving him of a hearing as provided by 103 Code Mass. Regs. §§ 421.00 (1994) (DSU regulations), the defendants had violated his rights under the regulations, his right to due process under the State and Federal Constitutions, and a "right to equal 'kindness' " under G. L. c. 127, § 32.[10] The complaint stated also that, as a protective custody prisoner, LaChance could not be held in segregation on awaiting action status for more than ninety days under DOC policies codified at 103 DOC § 422 (2008), governing the administration of inmates held in protective custody units.[11] For his alleged injuries, LaChance sought compensatory and punitive damages and a declaration that the defendants' actions were unlawful, along with other relief that is not relevant to this appeal.

In August, 2009, the parties again filed cross motions for summary judgment, and in April, 2010, a judge in the Superior Court allowed LaChance's partial motion for summary judgment, granting him the relief he requested at that stage. In relevant part, the judge declared that (1) the conditions of LaChance's confinement in the SMU were substantially similar to those in a DSU, and (2) the defendants had violated LaChance's

---

[10]"The superintendents of the institutions under the supervision of the department of correction shall treat the prisoners with the kindness which their obedience, industry and good conduct merit." G. L. c. 127, § 32.

[11]Section 422.05 of the DOC's policies governing the administration of inmates held in protective custody units, 103 DOC § 422.05 (2008), provides:

"Following serious violent behavior by a protective custody inmate, or serious disciplinary charges involving the risk of violence or a threat to the good order of the institution, a protective custody inmate may be held in [segregated custody] in awaiting action status pending completion of any department investigation or disciplinary or classification process, provided, however, that the total amount of time in awaiting action status shall not exceed 45 days, unless the commissioner shall personally approve a further period or periods of not more than 15 days. In no event, shall the total amount of time in awaiting action status exceed ninety (90) days."

due process rights by denying him the procedural protections afforded by the DSU regulations.[12]

The judge also allowed the defendants' cross motion for summary judgment on LaChance's claim for damages under the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H and 11I, concluding that he had provided no evidence that his rights had been interfered with by use of "threats, intimidation or coercion." Further, the judge allowed the defendants' motion for summary judgment on the claims for damages under 42 U.S.C. § 1983 (2006) (§ 1983), as to which the defendants were sued in their official capacity. See *Will* v. *Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (State officials acting in official capacity not liable as "persons" under § 1983). However, the judge rejected the defendants' argument that § 1983 claims against them in their individual capacity were barred by the doctrine of qualified immunity. Citing *Haverty* v. *Commissioner of Correction*, 437 Mass. 737 (2002), *S.C.*, 440 Mass. 1 (2003) (*Haverty*), he reasoned that it was clearly established at the time of the alleged violations that, because the conditions of LaChance's confinement were essentially identical to those of a DSU, he was owed the procedural protections afforded by 103 Code Mass. Regs. §§ 421.00. See *id.* at 763 ("the procedural protections contained in [the DSU regulations] must be afforded to all prisoners before they are housed in DSU-like conditions"). Thus, the judge concluded, the defense of qualified immunity was unavailable with respect to those claims. See, e.g., *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818-819 (1982).

*Discussion.* 1. *Due process.* To ascertain whether LaChance's due process rights were violated, we must determine first whether he enjoyed a liberty interest that was entitled to procedural protection. If he did, we examine whether DOC's procedures were constitutionally adequate to protect that interest. See *Kentucky Dep't of Corrections* v. *Thompson*, 490 U.S. 454, 460 (1989); *Torres* v. *Commissioner of Correction*, 427 Mass. 611, 617-618, cert. denied, 525 U.S. 1017 (1998).

Where a prison inmate is placed in segregated confinement,

---

[12]The judge ruled also that the defendants had violated LaChance's rights under DOC regulations with respect to the possession of legal papers. That question is not before us.

any attendant liberty interest is limited to "freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin* v. *Conner*, 515 U.S. 472, 484 (1995). Whether such hardship exists is determined by examining both the degree and the duration of restrictive confinement. *Id.* at 486. We conclude that LaChance's ten-month placement in the SMU constituted the sort of "atypical and significant hardship" that triggers a right to procedural safeguards.

The undisputed facts in the summary judgment record show that the conditions of LaChance's confinement were significantly more restrictive than those to which he was subjected as a resident of the J-1 general population unit. Indeed, they bore notable similarities to conditions which the United States Supreme Court has described as "synonymous with extreme isolation." *Wilkinson* v. *Austin*, 545 U.S. 209, 214, 224 (2005) (finding prison inmate had liberty interest under *Sandin* case, in avoiding assignment to Ohio's maximum security facility where inmates were held in individual cells for twenty-three hours per day, provided limited recreational opportunities, required to eat alone inside their cells, and afforded only "rare," noncontact visitations).

Additionally, the conditions of LaChance's confinement in the SMU were, as the judge found, essentially equivalent to those in the system's designated DSUs, and in some respects even more restrictive. See, e.g., *Haverty*, *supra* at 743 n.13, 747 & n.17 (inmates confined to DSU had limited out-of-cell time, including one hour of outdoor recreation, five days per week, and two hours of library visitation; ate meals alone in their cells; were allowed three showers per week; enjoyed fifty dollars per week canteen allowance; and were entitled to two hours of weekly visitation time). Although we have never expressly determined that placement in a DSU triggers an inmate's constitutional right to due process, we have held that under DOC regulations, indefinite confinement in any unit where conditions are substantially similar to those of a DSU entitles an inmate to the protections afforded by the DSU regulations. See *id.* at 756-757, 759-760. Further, we have expressed the view that the protections afforded by the DSU regulations are

mandated by due process considerations. See *Hoffer* v. *Commissioner of Correction*, 412 Mass. 450, 455 (1992) ("These procedural protections [in the DSU regulations] reflect the understanding that commitment of a resident to a segregated unit results in a significant reduction of that resident's liberties. The regulations . . . serve to ensure that residents will not be unnecessarily or arbitrarily retained in the DSU"). See also *Haverty*, *supra* at 762 (describing DSU regulations as "constitutionally required regulatory scheme"). Although not directly controlling, those cases support our conclusion that the conditions of LaChance's confinement implicate due process concerns.

Turning to the duration of LaChance's confinement, we first note that the acceptable length of an administrative segregation is governed by a rule of reason. See, e.g., *Royce* v. *Commissioner of Correction*, 390 Mass. 425, 430 n.9 (1983) ("At some point in time, confinement [in administrative segregation] . . . becomes unreasonable"); *Puckett* v. *Commissioner of Correction*, 28 Mass. App. Ct. 448, 451 (1990) ("rule of reason . . . dictates the point beyond which awaiting action status lawfully may not be continued"). See also *Hudson* v. *Commissioner of Correction*, 431 Mass. 1, 6 (2000). A number of cases have identified periods of confinement that were deemed not long enough to trigger due process protections. See, e.g., *id.* (administrative segregation for "total of six or seven weeks" was not unreasonable). See also Martin *vs.* Clavin, U.S. Dist. Ct., No. 08-11971-MBB (D. Mass. Sept. 9, 2010) (confinement for four days on awaiting action status); Balsavich *vs.* Mahoney, U.S. Dist. Ct., No. 03-CV-11344-RGS (D. Mass. July 6, 2004) (confinement in segregation for seven weeks pending notification of disciplinary charges).[13] However, the outer limit of what constitutes a reasonable term of administrative segregation has not been articulated.

In light of the restrictive conditions to which LaChance was subjected in the SMU — and particularly in comparison with

[13]In *Puckett* v. *Commissioner of Correction*, 28 Mass. App. Ct. 448, 451 (1990), the Appeals Court concluded that "a restrictive detention of over five and one-half months . . . was unreasonable as matter of law." However, that case was decided on regulatory rather than constitutional grounds. *Id.* at 450. In any case, that decision predated the Supreme Court's opinion in *Sandin* v. *Conner*, 515 U.S. 472 (1995).

the conditions of inmates housed in the general population unit where he had previously resided — we conclude that his ten-month detention on awaiting action status exceeded the bounds of reasonable confinement in administrative segregation, and gave rise to a liberty interest that was entitled to the protection of due process. Furthermore, the procedures followed by DOC were insufficient to safeguard that interest from abuse. Throughout his confinement in the SMU, LaChance was given weekly review by a prison official in compliance with the regulations governing SMU administration. See note 7, *supra.* None of these reviews entailed giving LaChance notice of the proceedings, much less an opportunity to speak on his own behalf or to test the purported basis for his continued confinement. And, although he was given notice each week of the administrative rationale for his detention in the SMU, he was never informed of steps that he might take to mitigate the perceived need to retain him in segregation pending some further action by DOC. Cf. *Hoffer* v. *Commissioner of Correction*, *supra* at 456 (inmate confined to DSU without conditional release date "and conditions by which to guide his behavior is possibly subjected to arbitrary treatment").

We have long recognized that, owing to difficulties inherent in prison management, prison administrators enjoy "broad discretion in the administration of prison affairs." *Kenney* v. *Commissioner of Correction*, 393 Mass. 28, 35 (1984). Nonetheless, we have expressed concern about the possibility that prison officials may use awaiting action classification as a pretext to confine indefinitely an inmate in segregated custody, with no meaningful opportunity for review of the inmate's status. See, e.g., *Royce* v. *Commissioner of Correction*, *supra* at 429-430 (prison administrators "may not abuse their discretion . . . by using awaiting action status as a means to accomplish an unlimited punishment immune to the procedures set forth in the rules and regulations"). See also *Haverty*, *supra* at 762.

We conclude that an inmate confined to administrative segregation on awaiting action status, whether such confinement occurs in an area designated as an SMU, a DSU, or otherwise, is entitled, as a matter of due process, to notice of the basis on which he is so detained; a hearing at which he may contest the asserted

rationale for his confinement; and a posthearing written notice explaining the reviewing authority's classification decision. The appropriate time frame for such actions must balance the inmate's interest — to challenge potentially arbitrary detention in severe conditions — with that of prison officials — to secure the reclassification or transfer of an inmate who poses a threat to himself, to fellow inmates, or to the security of the facility. Although we leave it to the DOC to promulgate regulations that reflect the balance of these interests, we conclude that in no circumstances may an inmate be held in segregated confinement on awaiting action status for longer than ninety days without a hearing.[14]

2. *Qualified immunity.* Having concluded that LaChance suffered an abridgment of his due process rights, we must determine whether the defendants are nevertheless entitled to summary judgment on the ground that LaChance's claims for damages against them personally are barred by the doctrine of qualified immunity. We conclude that they are.

The standard for qualified immunity is well settled. "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rodriques* v. *Furtado*, 410 Mass. 878, 882 (1991), quoting *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982). A right is only clearly established if, at the time of the alleged violation, "the contours of the right allegedly violated [were] sufficiently definite so that a reasonable official would appreciate that the conduct in question was unlawful." *Longval* v. *Commissioner of Correction*, 448 Mass. 412, 419 (2007). Put another way, we must determine whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*, quot-

---

[14]Our decision is informed in part by reference to other DOC regulations. We note that where an inmate is held on awaiting action status in a DSU, he is entitled to such a hearing after fifteen days of confinement, or after thirty days if he has been charged with a disciplinary offense or if a disciplinary investigation is pending. 103 Code Mass. Regs. § 421.08(3) (1994). Title 103 Code Mass. Regs. § 430.21(2) states that "[a]n inmate [on awaiting action status] under investigation for a possible disciplinary offense should be charged with a disciplinary offense or released from [awaiting action] status within 90 days of placement on [awaiting action] status."

ing *Gutierrez* v. *Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 403-404 (2002).

As we have noted, to this point, neither State nor Federal law has clearly articulated the outer limit of what constitutes "reasonable" segregated confinement on awaiting action status without the safeguards of procedural due process. Because we announce today for the first time that segregated confinement on awaiting action status for longer than ninety days gives rise to a liberty interest entitling an inmate to notice and a hearing, we conclude that it would not have been clear to reasonable officers in 2006 that their behavior violated LaChance's right to due process. We therefore remand the case for entry of summary judgment for the defendants with respect to those claims that allege constitutional violations in the defendants' individual capacities.

*Conclusion.* We affirm the order of the Superior Court insofar as it allows LaChance's motion for summary judgment, allows the defendants' motion for summary judgment on LaChance's claims under the Massachusetts Civil Rights Act, and allows the motion for summary judgment of the Commissioner of Correction and the superintendent of the SBCC. We vacate that portion of the order that denies the remaining defendants' motion for summary judgment in their individual capacities on LaChance's claims under 42 U.S.C. § 1983, and remand the case to the Superior Court for entry of an order allowing that motion.

*So ordered.*