NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1858                                        Appeals Court


ROBERT CANTELL & others[1] vs. COMMISSIONER OF CORRECTION &
others.[2]



No. 13-P-1858.

Suffolk.     December 12, 2014. - July 22, 2015.

Present:  Rubin, Milkey, & Carhart, JJ.


Moot Question.  Practice, Civil, Moot case, Dismissal of appeal,
    Class action.  Commissioner of Correction.  Administrative
    Law, Regulations.  Imprisonment, Segregated confinement.
    Due Process of Law, Prison classification proceedings.




Civil action commenced in the Superior Court Department on
January 20, 2012.

Motions to dismiss and for class certification were heard
by Elizabeth M. Fahey, J.


Bonita Tenneriello for the plaintiffs.
Sheryl F. Grant for the defendants.

_____

[1] Albert Jackson, Derrick Maldonado, John T. Fernandes,
Wilfredo Virella, and Luis Bizzarro.  Virella and Bizzarro did
not join the appeal.

[2] The superintendents of the Massachusetts Treatment
Center, Old Colony Correctional Center, MCI-Cedar Junction, MCI-
Shirley, MCI-Norfolk, MCI-Concord, NCCI-Gardner, MCI-Framingham,
and Souza-Baranowski Correctional Center.

MILKEY, J.  The plaintiffs are inmates at various State prison facilities who for a time had been held in segregated confinement in so-called "special management units" (SMUs).[3] They brought this action seeking declaratory and injunctive relief against the Commissioner and other officials of the Department of Correction (collectively, the DOC).  The plaintiffs' amended complaint alleged that they, and other inmates similarly situated, cannot be segregated in SMUs without being afforded certain substantive and procedural protections. Their claims were identical to ones raised by the inmate in LaChance v. Commissioner of Correction, 463 Mass. 767, 774-777 (2012).[4]  Thus, for example, like that inmate, the plaintiffs claimed inter alia that the conditions they faced in the SMUs were as onerous as those faced in so-called "departmental segregation units" (DSUs),[5] and that therefore the DOC was bound to extend to them the benefit of existing regulations governing confinement in the DSUs.  Once the Supreme Judicial Court issued its opinion in LaChance, a Superior Court judge dismissed this action without prejudice to the plaintiffs' filing a new

---

[3] See 103 Code Mass. Regs. §§ 423.00 (2007).

[4] The inmate in LaChance, who was represented by the same counsel as the plaintiffs, additionally sought monetary damages.  463 Mass. at 768, 772.

[5] See 103 Code Mass. Regs. §§ 421.00 (1994).

complaint alleging "that [the] DOC is failing to properly comply with LaChance."[6]  For the reasons set forth below, we dismiss this appeal from the judgment as moot.

Framing the mootness question.  As an initial matter, we note that it is uncontested that the plaintiffs are no longer held in segregated confinement in SMUs.[7]  Accordingly, to the extent that their case seeks to assert their own rights, it is moot.  See Littles v. Commissioner of Correction, 444 Mass. 871, 872 n.3 (2005).  However, a moot case nevertheless can be heard if it presents an issue "of public importance, capable of repetition, yet evading review."  Superintendent of Worcester State Hosp. v. Hagberg, 374 Mass. 271, 274 (1978).[8]  As the

---

[6] The quoted language comes from the judge's memorandum and order allowing the DOC's motion to dismiss; the judgment itself does not state whether dismissal was with or without prejudice.  However, pursuant to Mass.R.Civ.P. 41(b)(3), as amended, 454 Mass. 1403 (2009), a judgment of dismissal does not operate as an adjudication on the merits if "the court in its order for dismissal [so] specifies."

[7] The two original plaintiffs had been released from SMU confinement by April of 2012 when the amended complaint was filed.  All but one of the additional named plaintiffs had been released from SMU confinement when the DOC filed its status report in December of 2012.  It is uncontested that this inmate has since been released.

[8] In a similar vein, the case law reveals that such litigation often has been pursued through class actions, as the plaintiffs here sought to do.  See, e.g., Haverty v. Commissioner of Correction, 437 Mass. 737 (2002), S.C., 440 Mass. 1 (2003); Longval v. Commissioner of Correction, 448 Mass. 412 (2007).  At least one Massachusetts opinion states that in a case that purportedly has been brought as a class action, a

dissent accurately points out, this long-recognized exception to the mootness doctrine has particular application to litigation involving inmate rights given the often ephemeral nature of the alleged improprieties being challenged. See, e.g., Commissioner of Correction v. Myers, 379 Mass. 255, 260-261 (1979); Abdul-Alázim v. Superintendent, Mass. Correctional Inst., Cedar Junction, 56 Mass. App. Ct. 449, 452 n.6 (2002). However, whether an appellate court should proceed to address an appeal that has become moot remains a matter of discretion. Lockhart v. Attorney Gen., 390 Mass. 780, 782-783 (1984). See Blake v. Massachusetts Parole Bd., 369 Mass. 701, 708 (1976). As explained below, in the wake of LaChance and the pending regulatory proceeding that LaChance spawned, we conclude that addressing the underlying substantive issues that the plaintiffs seek to raise would be improvident at this time.

The LaChance ruling. In LaChance, a Superior Court judge ruled on summary judgment that prison officials had violated an inmate's Federal and State due process rights by holding him in

_____

judge should, at least in some circumstances, address class certification before considering whether the case has become moot as to the named plaintiffs. Wolf v. Commissioner of Pub. Welfare, 367 Mass. 293, 297 (1975). Subsequent cases have treated Wolf as an example of the doctrine that courts may hear moot cases if they raise important issues that are "capable of repetition, yet evading review," not as establishing a distinct procedural rule applicable to class actions. See, e.g., Gonzalez v. Commissioner of Correction, 407 Mass. 448, 451-453 (1990).

an SMU for over ten months without a hearing in which he could seek to challenge his segregated confinement. 463 Mass. at 772-773. With regard to the inmate's claims for monetary damages pursuant to 42 U.S.C. § 1983 against the officials in their individual capacities, the judge ruled that the officials were not entitled to qualified immunity, because -- in the judge's view -- the inmate's due process rights clearly had been established by existing precedent. LaChance, supra at 773. On the officials' interlocutory appeal of the denial of their motion to dismiss the § 1983 claims, id. at 768 & n.3, the Supreme Judicial Court held that the officials were entitled to qualified immunity, id. at 777-778.

At the same time, the LaChance court affirmed the judge's ruling that the officials had violated the inmate's due process rights. In the key paragraph, the court stated as follows:

> "We conclude that an inmate confined to administrative segregation on awaiting action status, whether such confinement occurs in an area designated as an SMU, a DSU, or otherwise, is entitled, as a matter of due process, to notice of the basis on which he is so detained; a hearing at which he may contest the asserted rationale for his confinement; and a posthearing written notice explaining the reviewing authority's classification decision. The appropriate time frame for such actions must balance the inmate's interest -- to challenge potentially arbitrary detention in severe conditions -- with that of prison officials -- to secure the reclassification or transfer of an inmate who poses a threat to himself, to fellow inmates, or to the security of the facility. Although we leave it to the DOC to promulgate regulations that reflect the balance of these interests, we conclude that in no circumstances may an inmate be held in segregated

confinement on awaiting action status for longer than ninety days without a hearing."

LaChance, 463 Mass. at 776-777. Thus, while broadly sketching out the due process rights that the DOC had to provide to inmates who were held in an SMU on "awaiting action" status, the court otherwise left it to the DOC to promulgate new regulations to balance the competing interests at stake. The court took that approach even though it recognized that "the conditions of LaChance's confinement in the SMU were, as the judge found, essentially equivalent to those in the system's designated DSUs, and in some respects even more restrictive." Id. at 774.

The import of LaChance for the instant case. The LaChance court made clear that its holding was not limited to the inmate in that case but instead applied to all "inmate[s] confined to administrative segregation on awaiting action status." Id. at 776. Consequently, the DOC recognizes that, going forward, it is bound to provide all such inmates the due process rights recognized in LaChance.[9] In a January, 2013, status report requested by the motion judge, the DOC reported that it had begun the process of promulgating the new regulations required by LaChance, and that it would commence providing hearings to

---

[9] The amended complaint did not specify that the plaintiffs were confined in an SMU while "awaiting action," but both sides appear to have treated their confinement as such in their briefs. In any event, awaiting action status is subject to the review process governing SMUs generally. See 103 Code Mass. Regs. § 430.21(2) (2006).

inmates confined in an SMU even before the new regulations were finalized.

The plaintiffs argue that LaChance itself did not fully resolve the legal issues they raised in their amended complaint and that the completion of the pending regulatory process will not address the issues that remain open. Specifically, the plaintiffs contend that because the conditions of segregated confinement in an SMU are equivalent to those in a DSU,[10] then -- regardless of what the new regulations mandated by LaChance ultimately will say -- DOC is bound to apply its existing DSU regulations to all inmates segregated in an SMU for more than a brief period (including those held on awaiting action status).[11]

---

[10] The plaintiffs alleged that SMUs across the Commonwealth had equivalent or worse conditions than designated DSUs, and that allegation must be accepted as true in the context of a motion to dismiss. The dissent characterizes inmates held in SMUs under such conditions as a mere "subgroup" of all inmates held in SMUs. The extent to which this is true is not developed in this record.

[11] As the plaintiffs acknowledge, the Supreme Judicial Court previously has recognized that prison officials can temporarily confine inmates in segregation for "brief" periods without providing them the protections afforded by the DSU regulations. Haverty v. Commissioner of Correction, 437 Mass. 737, 764 (2002), S.C., 440 Mass. 1 (2003). The court further indicated that by the term "brief," it "ha[d] in mind days, not weeks." Id. at 764 n.36. The DSU regulations themselves require a hearing within fifteen days of an inmate's being placed in segregated confinement, or within thirty days if the inmate is being investigated or charged with a disciplinary offense. 103 Code Mass. Regs. § 421.08(3) (1994). This appears to be the principal procedural protection that the plaintiffs are seeking to secure.

They acknowledge that LaChance implicitly forecloses a claim that Federal due process requires that result.  However, relying on Haverty v. Commissioner of Correction, 437 Mass. 737 (2002), and other cases cited with approval in LaChance, 463 Mass. at 774-775, the plaintiffs claim that full compliance with the DSU regulations is independently required either by the State Constitution or by the regulations themselves.[12]  The plaintiffs additionally maintain that a two-decade old injunction issued by a single justice of the Supreme Judicial Court prohibits the DOC from amending the DSU regulations to make them less protective.  See Haverty, supra at 758 & n.26 (referencing the injunction).  Therefore, according to the plaintiffs, the judge could not dismiss their case based on LaChance.  Instead, they contend,

---

[12] In Haverty, the court stated that except where an inmate was held in segregated confinement for only a brief period (see note 11, supra), the DSU regulations applied "to all placement of prisoners in segregated confinement for nondisciplinary reasons for an indefinite period of time."  437 Mass. at 760.  As the plaintiffs acknowledge, LaChance, 463 Mass. at 774-775, clarified that the holding of Haverty is not based on Federal due process requirements.  However, as noted, LaChance arose as an interlocutory appeal of a judge's decision that DOC officials were not entitled to qualified immunity, and the court's opinion did not directly address whether compliance with the DSU regulations was required by State law.  Because LaChance cites to Haverty with approval, the plaintiffs argue that the broad statements in Haverty about the applicability of the DSU regulations continue to stand and that those statements must be grounded either in State constitutional law or in the wording of the DSU regulations themselves.  Their amended complaint also cited to G. L. c. 127, § 32 (requiring that inmates be treated with merited "kindness"), but the plaintiffs have abandoned that argument on appeal.

she first should have allowed them to put on their proof that the conditions of SMU confinement are as restrictive as those in the DSUs, and ultimately should have entered judgment requiring the DOC to comply with its DSU regulations as to all inmates held in segregated confinement in SMUs (including those on awaiting action status).

The DOC counters that even if older case law could be read along the lines that the plaintiffs suggest,[13] LaChance marks an implicit departure from that precedent. According to the DOC, it would make no sense for the Supreme Judicial Court to have directed it to go through the process of promulgating a new set of regulations if case law already made it clear that the agency was bound to apply its existing DSU regulations.[14] With regard to the plaintiffs' claim that the single justice's 1995 injunction continues to limit its ability to modify its

---

[13] The DOC does not concede that point and contends that the language in Haverty, 437 Mass. at 760, on which the plaintiffs seek to rely does not apply to inmates held in an SMU "awaiting action," because such confinement cannot be said to be for an "indefinite period of time" even if the event for which they are awaiting action has not been scheduled.

[14] In support of its position, the DOC accurately points out that even though the LaChance court agreed with the motion judge's conclusion that conditions at the SMU were at least as restrictive as in DSUs, 463 Mass. at 774, the court characterized the case law requiring application of the DSU regulations as "not directly controlling." Id. at 775. In addition, the court referred to the DSU regulations merely as "other DOC regulations" that "informed in part" the court's decision. Id. at 777 n.14.

regulations, the DOC notes that the full court directed it to issue the new regulations while providing guidance on what due process minimally requires. The DOC also highlights that there is no lawful basis for a court to prohibit it from amending its regulations as it deems appropriate, except to the extent that the agency is constrained by statutory or constitutional limitations. See Judge Rotenberg Educ. Center, Inc. v. Commissioner of the Dept. of Mental Retardation (No. 1), 424 Mass. 430, 466 (1997) ("[T]he judiciary lacks the authority to order a State agency to do anything that it is not required to do as a matter of law"), citing Attorney Gen. v. Sheriff of Suffolk County, 394 Mass. 624, 629-630 (1985).

As this debate between the parties suggests, there is some unresolved tension in the case law. The question is whether we should try to resolve that tension at this time in the current litigation -- now moot as to all named plaintiffs -- under the circumstances presented. We conclude that it would be improvident to do so. Although LaChance may not directly have resolved all the issues the plaintiffs seek to raise, it set in motion a regulatory process that will help frame any unresolved questions. Once the regulations mandated by LaChance have been issued and applied, any remaining claims about what additional process is due, if any, properly can be assessed based on "concrete fact situation[s]." Entergy Nuclear Generation Co. v.

Department of Envtl. Protection, 459 Mass. 319, 326 (2011),
quoting from Hadley v. Amherst, 372 Mass. 46, 52 (1977).  In
that manner, judicial review can take place in a far more
appropriate setting than the abstract one presented by what
remains of the current case.  See Hadley, 372 Mass. at 52
(noting that "[i]n the absence of a concrete fact situation, any
ruling as to the extent of the power granted [to a governmental
entity by the relevant statute] is likely to be either too
narrow or too broad").  In this regard, we note that an inmate's
assignment to an SMU can occur in a broad array of
circumstances, and the specific process that an inmate may be
due may vary somewhat with those particular circumstances.
Deferring consideration of the questions the plaintiffs seek to
raise until the DOC has drafted and begun to apply its
regulations will help allow informed review of such
considerations.  Although courts eventually may need to address
the issues the plaintiffs seek to raise (assuming they are
unsatisfied by the forthcoming regulations), consideration of
such issues now would be premature.  See Massachusetts Med. Soc.
v. Commissioner of Ins., 402 Mass. 44, 48-49 (1988) ("The better
policy is to allow the administrative process to run its course
before permitting appellate review, thereby granting the
administrative agency a sufficient opportunity to apply its

expertise to develop regulations in conformity with the statutory scheme").

For these reasons, we dismiss the appeal.

<u>Appeal dismissed</u>.

RUBIN, J. (dissenting).  I disagree with the majority's novel conclusion that we may refuse in our "discretion" to hear a case over which we have jurisdiction.

Mootness is an "aspect[] of justiciability."  O'Brien's Case, 424 Mass. 16, 18 (1996).  If a case is moot, there is a "jurisdictional defect."  Ibid.  Unlike Federal courts, however, our Supreme Judicial Court has concluded it has discretion to hear and decide moot cases when it serves the public interest. "In . . . circumstances where some of the usual aspects of justiciability are missing -- particularly where the case was moot as to the parties before the court -- we have proceeded to render an opinion, if a question of general importance was presented which required resolution and if the jurisdictional defect would not interfere with or confuse that resolution." Ibid.  In the case on which the majority would rely, Lockhart v. Attorney Gen., 390 Mass. 780, 782-783 (1984), the Supreme Judicial Court articulated this rule and, unremarkably, declined to hear and decide a moot case, id. at 784-785.

This case, however, is not moot, and there is no opinion holding that when a case is as a matter of law not moot, we have discretion not to hear it.  Rather, individuals with a claim of aggrievement over which a court has jurisdiction are entitled to know and be granted their rights, whatever they might be. Courts have a "virtually unflagging obligation . . . to exercise

the jurisdiction given them." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976).

This suit was brought as a putative class action. The allegedly wrongful conduct continues with respect to members of the putative class, even though it has ended with respect to the named plaintiffs. In these circumstances, "[i]f the underlying controversy continues, a court will not allow a defendant's voluntary cessation of his allegedly wrongful conduct with respect to named plaintiffs to moot the case for the entire plaintiff class." Wolf v. Commissioner of Pub. Welfare, 367 Mass. 293, 299 (1975). Rather, the case will be held not to be moot. Id. at 297. This determination is a question of law, not, as the majority now holds, one of determining whether it would be "improvident" or not to hear the case. Indeed, in Wolf itself, the trial court that had held the case moot was reversed for legal error, with no suggestion that it had discretion not to hear the case. See id. at 300. See also, e.g., State Tax Commn. v. Assessors of Haverhill, 331 Mass. 306, 308 (1954) (mootness is a "matter of law").[1]

Nor, I should point out, is there any prudential reason to wait for the regulations mandated by LaChance v. Commissioner of

---

[1] The plaintiffs' motion for class certification was denied solely as a logical consequence of the judge's ruling granting the defendants' motion to dismiss on the merits. The proper disposition of this case would include the judge on remand considering the plaintiffs' motion anew.

Correction, 463 Mass. 767, 777 (2012) -- which remain unissued years after that decision -- to decide this case.  LaChance says that due process requires, among other things, a hearing within ninety days for inmates confined to administrative segregation on awaiting action status.  Ibid.  The plaintiffs contend that they are entitled to the more stringent regulatory protections provided for those held in departmental segregation units (DSUs) -- including a hearing within fifteen days.  Whatever the precise terms of the new regulations, they will not eliminate this disparity, and there is no reason to make those held in these conditions wait for an adjudication of their rights.

The judgment below therefore must rise or fall on its merits, and it is to those I turn.

Those inmates before us on awaiting action status were not automatically placed because of that status in special management units (SMUs), units whose conditions, including solitary confinement in cells twenty-three hours per day, are "substantially similar" (LaChance, supra at 774) to the extremely harsh conditions in DSUs.  Rather, they were placed in SMUs only upon a determination by a prison official that their "continued presence . . . in the general population would pose a serious threat to life, property, self, staff or other inmates, or to the security or orderly running of the institution."  103 Code Mass. Regs. § 423.06 (2007) (explaining when administrative

segregation is permitted).  They were placed in SMUs only because they were deemed to warrant administrative segregation because of a threat to safety and security.  Before this placement, however, they were <u>not</u> afforded the detailed procedures required by 103 Code Mass. Regs. §§ 421.00 for placement in a DSU.  Those regulations require a hearing before an impartial board, 103 Code Mass. Regs. § 421.12, at which there must be "substantial evidence" that an inmate poses "a substantial threat" to either "to the safety of others; or . . . of damaging or destroying property; or . . . to the operation of a state correctional facility."  103 Code Mass. Regs. § 421.09 (1994).

In <u>Haverty</u> v. <u>Commissioner of Correction</u>, 437 Mass. 737, 763, 764 n.36 (2002), the Supreme Judicial Court said that as a matter of interpretation of the regulations, the procedural safeguards detailed in 103 Code Mass. Regs. §§ 421.00 "must be afforded to all prisoners before they are housed in DSU-like conditions" except for those prisoners "whose stay . . . is intended to be, and is, brief," meaning "days, not weeks."  The court reminded the Department of Correction (DOC) that "in 1995 the commissioner attempted to repeal the DSU regulations, but his attempt to do so was enjoined by a single justice of this court.  The commissioner did not appeal from the order of the single justice, nor does the record reflect that he has made any

subsequent attempt to modify or repeal the regulations." Id. at 758 (footnote omitted). Absent a court order to the contrary, these regulations thus "have the full force of law." Ibid. This has not changed since then, and because Haverty remains good law, the prisoners in this case are entitled to the protections of those regulations as a matter of State law.

The DOC essentially argues that LaChance, 463 Mass. at 774-775, overruled Haverty, supra, and means that these prisoners are entitled only to what LaChance commanded, and no more. The language of the LaChance opinion, robust with favorable citation to Haverty and to Hoffer v. Commissioner of Correction, 412 Mass. 450 (1992), certainly does not appear to have been intended to weaken the procedural protections for prisoners like these. In fact, the LaChance court reiterated that its prior decisions stated that (1) "under DOC regulations, indefinite confinement in any unit where conditions are substantially similar to those of a DSU entitles an inmate to the protections afforded by the DSU regulations," and (2) "the protections afforded by the DSU regulations are mandated by due process considerations." LaChance, 463 Mass. at 774-775, citing Hoffer, supra at 455, and Haverty, supra at 762. As the majority observes, the court noted that these prior decisions were "not directly controlling" on the issue actually decided, LaChance, supra at 775. However, this disclaimer seems to strengthen the

argument that LaChance did not overrule Haverty:  the State-law issue decided in Haverty was different from the issue the court was addressing in LaChance, that of Federal due process in the context of 42 U.S.C. § 1983.

On the other hand, as the majority indicates, it can be argued that, if the Supreme Judicial Court in LaChance was ordering the promulgation of regulations only for prisoners in DSU-like conditions, it must have meant to overrule Haverty.  If all the prisoners who would be entitled to the benefit of the regulations ordered by LaChance -- including primarily the requirement of a hearing within ninety days -- were already entitled under Haverty to the benefit of 103 Code Mass. Regs. §§ 421.00, which mandates a hearing within fifteen days, requiring the drafting of the new regulations would have been purposeless.  Rather than having done something purposeless, the argument goes, the Supreme Judicial Court must have overruled Haverty sub silentio.

The flaw in this argument lies in its major premise.  The procedures required by the court in LaChance are not only for those in conditions "substantially similar" to those in the system's designated DSUs.  Rather, the court concluded as a matter of Federal due process that the procedures it described are required for "an inmate confined to administrative segregation on awaiting action status, whether such confinement

occurs in an area designated as an SMU, a DSU, or otherwise." LaChance, 463 Mass. at 776. "Administrative segregation is a 'temporary form of segregation from general population used when the continued presence of the inmate in the general population would pose a serious threat to life, property, self, staff or other inmates, or to the security or orderly running of the institution.'" Id. at 769 n.4, quoting from 103 Code Mass. Regs. § 423.06 (2007). Nothing requires that those on administrative segregation be held in harsh conditions "substantially similar" to those in a DSU.

The court in LaChance said nothing about the question presented here: whether the subgroup of those held in administrative segregation on awaiting action status whose conditions of confinement are as harsh as those in DSUs are entitled as a matter of State law to the more stringent protections of 103 Code Mass. Regs. §§ 421.00. Under Haverty, the answer to that question is yes. But that does not render the LaChance regulations purposeless. The LaChance regulations still will articulate the protections required for those inmates held in administrative segregation in conditions which are not substantially as restrictive as those in a DSU, who are not entitled to the more robust protections of Haverty.

For these reasons, I would reverse the judgment of the trial court.