NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0243n.06

No. 09-2191

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Feb 29, 2012*

LEONARD GREEN, Clerk

CURTIS HARRIS,                                     )
                                                   )
        Plaintiff-Appellant,                       )        ON APPEAL FROM THE
                                                   )        UNITED STATES DISTRICT
        v.                                         )        COURT FOR THE WESTERN
                                                   )        DISTRICT OF MICHIGAN
PATRICIA L. CARUSO, Warden, et al.,                )
                                                   )
        Defendants-Appellees.                      )
                                                   )

BEFORE: BOGGS, ROGERS, and SUTTON, Circuit Judges.

ROGERS, Circuit Judge. Curtis Harris, a Michigan prisoner, brought this action under 42 U.S.C. § 1983, seeking damages for his eight-year confinement in administrative segregation.[1] Harris alleges that his segregation violated due process and constituted deliberate indifference. The district court granted summary judgment for the defendants. This was proper because Harris received due process throughout his segregation, and because the district court appropriately exercised its discretion by denying discovery on Harris's Eighth Amendment claim.

**I.**

In July 2002, Harris assaulted a prison staff member at the Ryan Road Correctional Facility. As a result, Harris was placed in administrative segregation because he posed a "serious threat to

---

[1] Harris initially sought injunctive relief in addition to damages, but he was released from administrative segregation on January 10, 2011, making injunctive relief moot.

[the] physical safety of others." R. 57-5. Beginning in August 2002, the prison began bi-monthly reviews of Harris's confinement status. These reviews were signed by housing unit staff and a "Segregation Supervisor," and approved by the "Security Classification Committee." R. 57-5 at 1-3. In 2003, reviews became less frequent, and occurred only monthly. R. 57-5 at 4-13. According to these reviews, Harris committed another "major misconduct" on July 24, 2003. *Id.*

In July 2004, Harris was transferred to Ionia Correctional Facility, where he remained in administrative segregation. Monthly reviews of Harris's confinement between mid-2004 and mid-2006 are not in the record. The next review of Harris's confinement that appears in the record occurred on April 27, 2006. R. 57-5 at 25. Signed by a "Security Classification Committee," the Warden, and the Regional Prison Administrator, this and subsequent monthly reviews considered factors such as Harris's "attitude and social adjustment," and prior "misconducts." *Id.* The reviews also contained evaluations conducted by the Housing Unit Staff. *Id.* The April 27 review was signed by Regional Prison Administrator James MacMeekin, a defendant here, who signed all subsequent reviews. *Id.*

Similar reviews were conducted for the duration of Harris's stay at Ionia. On May 25, 2006, the prison staff again reviewed Harris's segregation. R. 57-5 at 27-28. The housing unit team recommended that the prison reclassify Harris to general population. *Id.* The Security Classification Committee, however, recommended that Harris remain in administrative segregation. *Id.* MacMeekin approved Harris's continued confinement. *Id.* at 28. On August 17, 2006, Harris committed an unidentified misconduct. *Id.* at 31. Notwithstanding this misconduct, on August 24,

2006, the housing unit staff again recommended that Harris be returned to the general population. *Id.* at 29. Again, the Security Classification Committee recommended that Harris remain in administrative segregation. *Id.* at 30.

Harris was transferred to Alger Correctional Facility ("LMF") on October 10, 2006, and was placed in administrative segregation. The LMF staff also conducted periodic reviews of Harris's segregation. On a review dated October 16, 2006, the prison staff marked Harris's "potential to honor the trust implicit in less restrictive confinement" as "low." *Id.* at 31. Harris's subsequent reviews included intermittent positive marks in areas such as "attitude with staff" or "personal hygiene," but consistently low ratings for potential to "honor the trust implicit in less restrictive confinement." *Id.* Harris incurred a number of major misconducts after arriving at LMF: threatening behavior on November 10, 2006; assault and battery of a staff member on December 12, 2006; disobeying a direct order on December 18, 2006; threatening behavior on January 14, 2007; destruction of property on February 12, 2007; destruction of prison property on April 3, 2007; threatening behavior on April 4, 2007; threatening behavior on April 21, 2008; and an assault and battery of a staff member on May 1, 2008. R. 37, Ex. A.

Harris alleges that his health worsened while in administrative segregation. In June 2004, he suffered a brain aneurysm, which was surgically repaired. R. 1, Complaint at 3. Additionally, he claims to suffer from a host of other conditions, including hypertension and acid reflux. *Id.*

Harris sued Michigan Department of Corrections Director Patricia Caruso and Regional Prison Administrator James MacMeekin for violations of the Due Process Clause, Eighth

Amendment, First Amendment, and Equal Protection Clause. Harris also named as defendants a number of employees working at LMF (collectively the "LMF defendants"). The district court granted summary judgment in favor of all defendants. First, with regard to the due process claim, the district court held that Harris had a liberty interest but had been afforded the process he was due. Second, the court rejected Harris's Eighth Amendment claim because Harris failed to show that his medical issues were the result of confinement in administrative segregation. The court then rejected Harris's First Amendment and Equal Protection claims, which are not raised on appeal. Finally, the district court held that supervisory liability under § 1983 did not extend to Caruso because she lacked sufficient personal involvement. Because Harris could not establish a constitutional claim, the court held that the defendants were entitled to qualified immunity. Harris timely appealed.

## II.

Harris presses two claims on appeal: (1) that his confinement in administrative segregation violated his due-process rights; and (2) that the district court abused its discretion by denying discovery on Harris's Eighth Amendment claims before granting summary judgment. For the following reasons, both of these arguments lack merit.

### 1.    Due Process

As a threshold matter, Harris has a cognizable liberty interest due to the atypical duration of his administrative segregation. Because the Due Process Clause does not protect every change in the conditions of confinement, an inmate must establish his liberty interest by showing that his administrative segregation "imposes atypical and significant hardship on [him] in relation to the

ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The extent of the

hardship is weighed in light of the nature of the more-restrictive confinement and its duration. *See*

*Harden-Bey v. Rutter*, 524 F.3d 789, 794 (6th Cir. 2008). Although this court has found at least one

defendant did not have a liberty interest following a 30-month segregation, *Jones v. Baker*, 155 F.3d

810, 812 (6th Cir. 1998), Harris's confinement more than tripled that mark. In the only case cited

by the parties that involved segregation of a similar duration, eight years, the court found that a

liberty interest was implicated. *See Bean v. McQuiggin*, No. 2:07-cv-113, 2008 WL 4151351, at *5

(W.D. Mich. Sept. 2, 2008). Harris's segregation was similarly atypical. No matter how much

Harris deserved this isolation, the atypical duration created a liberty interest that triggered his right

to due process. This alone does not mean that Harris wins. Where a liberty interest is shown, the

due process claim "is not complete unless and until the State fails to provide due process." *Zinermon*

*v. Burch*, 494 U.S. 113, 126 (1990).

Before the court can determine whether Harris received due process, it must first determine

what process is due by applying three factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976):

> First, the private interest that will be affected by the official action; second, the risk
> of an erroneous deprivation of such interest through the procedures used, and the
> probable value, if any, of additional or substitute procedural safeguards; and finally,
> the Government's interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural requirement would
> entail.

*Wilkinson v. Austin*, 545 U.S. 209, 224-25 (2005) (quoting *Eldridge*, 424 U.S. at 335). The Supreme

Court has indicated that "[p]rison officials must engage in some sort of periodic review of the

confinement of such inmates [in administrative segregation]." *Hewitt v. Helms*, 459 U.S. 460, 477

n.9 (1983) (*abrogated on other grounds by Sandin*, 515 U.S. at 484). "This review will not necessarily require that prison officials permit the submission of any additional evidence or statements." *Id.* However, the decision to continue confinement must be supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985). This requirement balances the procedural rights of prisoner against the need of prison officials to have freedom to operate their facilities on a day-to-day basis. Under this law, Harris was entitled to a periodic review of his confinement, supported by some evidence or indicia of reliability.

Harris received meaningful, periodic reviews during the relevant portions of his confinement. Starting in April 2006, Harris received monthly reviews that were signed by the Housing Unit Staff, the Security Classification Committee, and MacMeekin.[2] R. 57-5 at 27-30. These reviews considered factors such as Harris's behavior and prior misconducts, as well as an interview with Harris when he chose to participate. Harris challenges the validity of two reviews that occurred prior to his transfer to LMF, dated May 25, 2006 and August 24, 2006. In these reviews, the Housing Unit Staff recommend that he be reclassified to general population; however, the Security Classification Committee recommended continued segregation. R. 57-5 at 27-30. Ideally, the May 25 and August 24 reviews would have set forth the precise rationale for the Committee's rejection of the Housing Unit Staff's recommendation. However, this does not make the reviews constitutionally deficient. The reviews indicate that Harris could have participated in the process, and that three levels of

---

[2] Although Harris had received prior reviews, no defendant was personally involved before April 27, 2006. Accordingly, the court does not need to determine whether the prior reviews were sufficient.

review occurred.  Given Harris's history of violent and disruptive behavior, a jury could only have found that the decision to continue Harris's segregation was a legitimate and reasonable one.  The wisdom of this decision was confirmed by Harris's subsequent "bondable misconduct" on August 17, 2006, which was reflected in his October 16, 2006 review.  R. 57-5 at 31.  Based on this, coupled with his extensive list of misconduct, a reasonable jury could only conclude that Harris received meaningful, periodic reviews before his transfer to LMF.

Harris continued to receive meaningful, periodic reviews following his transfer to LMF.  A commission periodically reviewed Harris's confinement status pursuant to the applicable Michigan regulations.  *See* MDOC Policy Directive 04.05.120 §§ BBB-HHH. Although the Housing Unit Staff gave Harris positive marks in areas such as "attitude with staff" or "personal hygiene," the staff consistently determined that Harris had a "low" potential to "honor the trust implicit in less restrictive confinement."  R.37, Ex. B.  Harris was allowed to participate in the review process, an opportunity he exercised sporadically.  *Id*.

The monthly reviews conducted at LMF cross-referenced reports of misconduct, which is "some evidence" supporting the decision to continue Harris's confinement.  For example, his December 2006 review incorporates by reference a November 10, 2006 Major Misconduct Report. *Id.*  On that date, Harris expressed an intent to physically assault prison staff.  R. 37, Ex. A.  An independent hearing officer upheld the charge at a hearing conducted on November 15, 2006.  *Id.* Harris subsequently incurred major misconducts for: assault and battery of a staff victim on December 12, 2006; disobeying a direct order on December 18, 2006; threatening behavior on

January 14, 2007; destruction of property on February 12, 2007; destruction of prison property on April 3, 2007; threatening behavior on April 4, 2007; threatening behavior on April 21, 2008; and an assault and battery of a staff member on May 1, 2008. *Id.* Harris was found guilty of these offenses by an independent administrative hearing officer who is not employed by the Michigan Department of Corrections. *Id.*, Ex. D, Aff. of David Bergh. The longest Harris went without incurring a major misconduct at LMF was 12 months: April 2007 to April 2008. *Id.* At no time during his stay at LMF did the Housing Unit Staff believe that Harris was capable of honoring the trust implicit in a less restrictive confinement.

Harris attacks these reviews, clinging to isolated notations that he believes show that the reviews were a sham. For example, he points to an October 16, 2006 review in which Harris's "attitude and social adjustment" was rated as either "good" or "fair." Appellant Br. 6. From this, Harris argues that the decision to continue his isolation had "no basis." *Id.* However, this October 16 review was performed six days after Harris's arrival at LMF. One month later, Harris assaulted a prison staff member. No reasonable jury could have concluded that the October 16 review was anything but a preliminary evaluation. Given the fact that Harris had been in administrative segregation for the preceding four years, no reasonable prison official would revoke that status after six days of good behavior.

Harris also points to a one-year period (actually one year and ten days before his next major misconduct) during which he incurred no major misconduct violations. During this period, Harris received a comment on his June 2007 review that he should "continue positive behavior." Appellant

Br. at 7. However, in March 2007, the Housing Staff reported that Harris had a "problem with certain staff" and "gets angry quickly." R. 37-5 at 14. And in July 2007, the staff reported that Harris "can have explosive behavior out of nowhere, where he doesn't follow staff direction and becomes assaultive." *Id.* at 8. Although the reviews of his confinement reflect sporadic periods of good behavior, such as in June 2007, this acceptable behavior is intermingled with troubling reports of violent, explosive incidents. Even though Harris received no misconduct citations during this period, the jury could only find that the decision to continue segregation was not a sham. As the district court noted, "[t]he fact that [Harris] disagrees with the reasoning and recommendations of the [reviewing committee] does not render the periodic reviews constitutionally deficient." *Harris v. Caruso*, No. 2:08-cv-105, 2009 WL 2777160, at *3 (W.D. Mich. Aug. 31, 2009).

Harris relies in large part on incidents that occurred before the defendants were personally involved. MacMeekin's personal involvement started on April 27, 2006. The personal involvement of the LMF defendants began when Harris was transferred to LMF on October 10, 2006. Harris's reliance on events that occurred before April 2006 is misplaced.[3]

Nor does *Massachusetts Correctional Institution v. Hill*, 472 U.S. 445, 455 (1985) compel a different conclusion. In *Hill*, a good-time-credit revocation case, the Court determined that "the requirements of due process are satisfied if some evidence supports the decision by the prison

---

[3] Among other things, Harris contends he received good marks and remained misconduct free for a seventeen-month span from 2003 to 2004. Appellant Br. at 5-6. Defendants are not liable for the actions that pre-dated their personal involvement.

disciplinary board." 472 U.S. at 455. As discussed above, there was ample evidence on which the prison disciplinary board relied in making the segregation determination.

The other case on which Harris relies is also distinguishable. In *Sourbeer v. Robinson*, 791 F.2d 1094 (3rd Cir. 1986), the Third Circuit determined that a fifteen-year-old inmate in administrative segregation was denied due process by "perfunctory" reviews of his confinement status. *Id*. 1101-1102. The court found these reviews inadequate because, among other things: (1) the reviews merely reiterated the initial reason for his segregation; (2) the inmate had not been issued any misconducts during his stay; and (3) the witnesses at his review did not have "professional dealings or day-to-day contact" with the inmate. *Id.* In contrast, Harris's reviews list not only his original misconduct that started his segregation, but also listed factors such as his erratic behavior and subsequent misconducts. Further, it is undisputed that Harris had numerous misconducts following his segregation, which included subsequent assaults on prison staff. Finally, the reviews were completed, in part, by the Housing Unit Staff who had daily contact with Harris. For these reasons, *Sourbeer* is distinguishable.

## 2.      Eighth Amendment

Harris challenges the district court's decision to grant summary judgment with regard to his Eighth Amendment claim before he was allowed discovery. However, in the qualified-immunity context, "[o]nly after the court inquires into whether any facts material to Plaintiff's claims are genuinely at issue, and only upon a finding that material facts are in fact in dispute is a court at liberty to hold a motion for summary judgment in abeyance pending additional discovery." *Summers*

*v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004). When a motion for summary judgment is filed, the party opposing the motion may explain why he is entitled to additional discovery. Fed. R. Civ. P. 56(f). The request must specify what facts might be revealed by this additional discovery. Harris stated that he needed discovery to demonstrate an issue of fact, but failed to specify which facts he hoped to discover. R. 57. In this case, like in *Summers,* "[b]are allegations or vague assertions of the need for discovery are not enough." *Summers*, 368 F.3d at 887. Harris was not entitled to the discovery he sought.

### 3.    Supervisory Liability

Harris failed to allege facts establishing that Caruso was personally involved in the activity that forms the basis of his claims. *See Harris v. Caruso*, No. 2:08-cv-105, 2009 WL 2777160, at *5 (W.D. Mich. Aug. 31, 2009). In the context of a § 1983 claim, a supervisor is not liable for actions of her subordinates unless she personally participated in the offensive conduct. *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989). Here, Harris alleges that Caruso denied over 100 institutional grievances. R. 57 at 2. A denial of a prisoner's institutional grievances is insufficient to support a claim of supervisory liability in the §1983 context. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). Accordingly, the district court properly granted Caruso summary judgment based on her lack of personal involvement

### III.

The district court's order granting summary judgment is affirmed.