SUPERIOR COURT 
 
 ANTHONY LEO v. CAROL MICI, Commissioner of Correction, MICHAEL RODRIGUES, Superintendent of MCI-Concord, SHEILA CREATON-KELLY, Deputy Superintendent of Re-entry of MCI- Concord, and DANNY ORTIZ, Director of the Secure Adjustment Unit at MCI-Concord

 
 Docket:
 2084CV01728-C
 
 
 Dates:
 February 19, 2025
 
 
 Present:
 Robert B. Gordon
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
 
 

 BACKGROUND
            The Complaint in this case asserts a scattershot of claims against multiple Defendants employed by the Massachusetts Department of Correction (the "DOC"). All such claims, however, are premised on a single and unifying factual contention. Namely, that by assigning Plaintiff Anthony Leo ("Leo" or the "Plaintiff') to the Secure Adjustment Unit ("SAU") at MCI- Concord between July, 2019 and February, 2020, during which time Leo awaited a pending disciplinary adjudication, Defendants placed Plaintiff in the "functional equivalent" of a "Restrictive Housing" unit. Leo so placed, the Complaint alleges, the DOC Defendants violated his rights to the privileges and protections afforded inmates confined in Restrictive Housing under the Criminal Justice Reform Act ("CJRA"), the DOC's own regulations, the due process
 
                                                            -1-
 
provisions of the United States Constitution and Massachusetts Declaration of Rights as expounded by the Supreme Judicial Court ("SJC") in LaChance v. Commissioner of Corr., 463 Mass. 767 (2012) ("LaChance"), and other unspecified principles of state and federal constitutional law.
            For some 219 days in the latter half of2019 and the beginning of 2020, Leo was housed in MCI-Concord's SAU while he awaited the disposition of a disciplinary proceeding. Plaintiff insists that this species of confinement was as or more restrictive than the conditions of detention that prevail in a Restrictive Housing Unit within the facility, and that the SAU is in fact the equivalent of Restrictive Housing in all respects except the name. Treating the SAU in which he was confined as a de facto Restrictive Housing unit, Plaintiff claims that the Defendants' denial to him of periodic classification and placement review hearings in accordance with the dictates of LaChance, together with their withholding of certain canteen purchasing and television viewing privileges that would purportedly avail to him in such housing, constitute actionable violations of law.
            Presented for decision is the Defendants' Motion for Summary Judgment. For the reasons which follow, the Defendants' motion shall be ALLOWED.
FACTS
            The facts of this case appear undisputed in all material respects. Plaintiff Leo was, between July, 2019 and February, 2020, confined within MCI-Concord's SAU while he awaited the investigation and disposition of a disciplinary offense for distributing drugs and/or drug paraphernalia. (See SOF, Ex. D.)[1] DOC regulations define the SAU as a "highly structured unit that is not Restrictive Housing and that provides access to cognitive behavioral treatment,
 
--------------------------------------------
 
[1] Plaintiff was sentenced to life in prison following a guilty plea to aggravated rape and other related charges. Leo v. Commonwealth, 449 Mass. 1025, 1025 (2007).
                                                            -2-
 
education, programs, structured recreation, leisure time activities, and mental health services for those inmates diverted from or released from Restrictive Housing." 103 Code Mass. Regs. § 430.05. The operations of the SAU are not the subject of formal penological regulations, but are instead governed by a "Massachusetts Department of Correction MCI-Concord Secure Adjustment Unit Handbook" (the "SAU Rules") furnished to all inmates upon their entrance into the unit. (See SOF, Exs. A, A-1.)
            Inmates housed in the SAU at the time of Leo's placement there were permitted time outside of their cells for not less than three hours per day, as follows: (a) one hour per day for time in the unit's common area (where they are allowed to shower, use the telephone, watch the unit's television, and socialize with other prisoners); (b) one hour of recreation per day in a yard separate from the prison's general population; and (c) rehabilitative programming for one hour per day. (See id.; Compl.)[2] Two days each week, inmates' out-of-cell time is increased to four hours per day.
            According to the SAU Rules, the DOC developed the SAU to provide inmates with the foundational skills needed to maintain a productive lifestyle for the remainder of their incarceration, and to prepare them for successful reintegration into society thereafter. SAU residents are thus assigned to meet bi-weekly with a one-on-one counselor to address personal goals related to their circumstances, and are additionally afforded the opportunity to participate in rehabilitative programs in group settings. Representative program offerings include Drug and Alcohol Education; Relapse Prevention; Criminal and Addictive Thinking; Release and Reintegration; and Socialization. The summary judgment record reflects that Leo participated in substantial amounts of such programming during his SAU placement.
 
--------------------------------------------
 
[2] Inmates who choose not to participate in rehabilitative programming offered by the prison, however, do not receive an additional "make-up" hour of out-of-cell time.
 
                                                            -3-
 
            In August, 2019, shortly after the start of his term in the SAU, Leo initiated a series of grievances addressed to the terms and conditions of his confinement. The first grievance (filed in August, 2019) challenged the imposition of"restrictive" limits on Leo's canteen purchases. A second grievance (filed that same month) alleged that the SAU was being operated as a "segregation unit," differentiated from "Restrictive Housing" in name only and in violation of the CJRA. A third grievance (filed in November, 2019) demanded that Leo be provided with "the due process protections via safe guarded hearings" -- determined to mean a placement review hearing for imnates confined for more than 90 days in "Restrictive Housing," in accordance with the SJC's pronouncements in LaChance. Leo filed a fourth grievance in December, 2019, again asserting that his detention in the SAU during the pendency of his disciplinary status amounted to Restrictive Housing that entitled him to a due process hearing to review his placement. Finally, Leo filed a fifth grievance in January, 2020, alleging that the SAU's refusal to afford him access to the DOC's "Photograph Program" was improper, and once again suggesting that such denial marked the SAU as a form of"Restrictive Housing."
            The DOC denied each of the foregoing grievances in accordance with its internal administrative procedures. In each instance, MCI-Concord officials declared that the SAU did not qualify as "Restrictive Housing" under the DOC regulations defining same, and was thus not subject to either the provisions of the CJRA or the LaChance placement review hearings Leo had invoked.
            Plaintiff was released from the SAU in February, 2020, and commenced this lawsuit in July, 2020.
 
                                                            -4-
 
DISCUSSION
            I. SUMMARY JUDGMENT STANDARD
            Summary judgment is properly allowed where there are no genuine issues of material fact, and the record demonstrates that the moving party is entitled to judgment as a matter of law. See Mass. R. Civ. P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419,422 (1983). The moving party bears the burden of affirmatively demonstrating both that there is no genuine issue of material fact on every relevant issue, and that it is entitled to judgment in accordance with the applicable law. See Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). The moving party may satisfy this burden by submitting evidence negating an essential element of the non-moving party's claim, or by demonstrating that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. See Flesner v. Technical Commc'ns Corp., 410 Mass. 805, 809 (1991). Once the moving party satisfies this threshold burden, the burden shifts to the party opposing summary judgment, who must then identify specific record evidence establishing the existence of a genuine issue of material fact warranting trial. See Kourouvacilis v. General Motors Corp.. 410 Mass. 706, 711 (1991). "[C]onclusory statements, general denials, and factual allegations not based on personal knowledge are insufficient to avoid summary judgment." O'Rourke v. Hunter, 446 Mass. 814, 821 (2006) (citation and quotation omitted).
            II. PLAINTIFF'S CLAIMS
            Although Plaintiffs Complaint sounds in 54 counts, with duplicative claims asserted against each of four different DOC Defendants, all rest upon the core contention that Leo was, for 219 days, confined in detention qualifying as "Restrictive Housing." So confined, Plaintiff claims that he was denied rights and protections owed to him (including, without limitation, classification and placement hearings due inmates under the CJRA, under DOC regulations, and
 
                                                            -5-
 
under the constitutional due process provisions expounded in LaChance).
            The Court does not agree. Inasmuch as the undisputed facts of record demonstrate that the SAU where Leo resided was neither "Restrictive Housing" as defined in Massachusetts law, nor its functional equivalent in all material respects, Plaintiff's Complaint fails to state viable claims. These claims will be addressed in turn.
            A. CRIMINAL JUSTICE REFORM ACT
            In Counts 5, 6, 16, 17, 26, 27, 36, 37, 42-45 and 54 of the Complaint, Plaintiff alleges that the Defendants' placement of Leo in the SUA, and their denial to him of a placement hearing and other specified rights and benefits (viz., access to television viewing, to the same canteen purchasing privileges afforded to inmates in the general prison population, and to unlimited vocational programming) violated provisions of the CJRA, G.L. c. 127, §§ 39, 39B.
            Plaintiff's claims lack merit, because the statutory provisions upon which Leo relies only apply to prisoners in "restrictive housing." G.L. c. 127, § 30. Under this statute, inmates "in restrictive housing" (emphasis supplied) are entitled to placement reviews in which they can challenge their residential assignment at prescribed intervals, G.L. c. 127, § 39B(a)-(c); to "radio or television if confinement exceeds 30 days," G.L. c. 127, § 39B(v); to "canteen privileges" that are coextensive with those of other inmates housed in the same facility, G.L. c. 127, § 39B(viii); and to "vocational, educational and rehabilitative programs to the maximum extent consistent with the safety and security of the unit" if the prisoners are "held in restrictive housing for a period of time more than 60 days." G.L. c. 127, § 39E.
            Under the CJRA, "[R]estrictive [H]ousing" is defined as "a housing placement where a prisoner is confined to a cell for more than 22 hours per day." G.L. c. 127, § 1. In the case at bar, the undisputed evidence is that the SAU is not considered Restrictive Housing, and is instead
 
                                                            -6-
 
defined in the SAU Rules (and widely understood) as a rehabilitation-oriented form of confinement for prisoners who have been diverted or released from Restrictive Housing. Thus, no inmate in the SAU is confined to his cell for more than 22 hours per day; and, consistent with the greater freedoms they enjoy, all such prisoners (including Leo) are guaranteed at least three out-of-cell hours per day for showering, leisure activity, socialization, outdoor recreation, and participation in myriad rehabilitative programming. (See Comp!.,¶ 37; SOP, Ex. A-1.)
            Plaintiff does not dispute the fact that, throughout his placement in the SAU, he was not involuntarily confined to his cell more than 22 hours per day;[3] and he likewise does not dispute that he enjoyed rights and privileges afforded to general population inmates not ordinarily available to Restrictive Housing prisoners.[4] Plaintiffs argument instead reduces to the proposition that SAU placement is "close enough" to Restrictive Housing to be considered its equivalent as a matter of law. This argument, that close enough is good enough, plainly lacks merit, calling upon the Court to reimagine the CJRA by disregarding its clear and unambiguous definition of"[R]estrictive [H]ousing." The Court has no authority to recognize statutory claims that fly in the face of the very statute upon which they rely. See Commissioner of Corr. v. Superior Court, 446 Mass. 123, 126 (2006) (A court may not "read into the statute a provision which the Legislature did not see fit to put there, nor add words that the Legislature had an
 
--------------------------------------------
 
[3] Plaintiffs argument that an inmate's decision to forego rehabilitative programming made available to SAU prisoners one hour each day results in confinement to the cell for 22 hours (because, under the SAU Rules, the hour of foregone rehabilitative programming cannot be swapped for a different kind of out-of-cell hour -presumably to encourage rehabilitation activities) is without merit. The undeniable essence of cell confinement for purposes of the statutory definition of"Restrictive Housing" is that such confinement be involuntary. A prisoner who, on his own initiative, elects not to participate in the out-of-cell programming offered to him by the DOC cannot be considered "confined" to his cell during that hour. Any more than a prisoner who voluntarily declines a meal can be deemed to have been deprived of nutrition.
[4] To be sure, Plaintiff alleges that he was denied certain privileges that the CJRA and associated regulations guarantee to inmates in Restrictive Housing - e.g., a radio or television - but these guarantees are plainly intended to counterbalance the otherwise highly stringent and isolating conditions of Restrictive Housing to which Plaintiff, indisputably, was not subjected.
 
                                                            -7-
 
option to, but chose not to, include.").[5] See also Gaskins v. Mici, Commissioner of Corr., et al., No. 1981CV03003 at* 5 (Middlesex Super. Ct. Aug. 5, 2024) (Wilson, J.) (rejecting MCI- Concord SAU inmates' claims to denied television, canteen and vocational programming privileges under CJRA, because they did not reside in "restrictive housing": "Given that the statute Plaintiffs invoke already provides a definition of"Restrictive Housing," that definition controls. Because Plaintiffs concede that they were not held in statutorily-defined restrictive housing during the relevant period, neither of the invoked provisions of Chapter 127 offers Plaintiffs the protections they seek.").
            The Defendants' Motion for Summary Judgment, therefore, shall be allowed as to Plaintiffs claims under the CJRA.
            B. DEPARTMENT OF CORRECTION REGULATIONS
            In Counts 7-10, 18-21, 28-31, 38-41, and 46-53 of the Complaint, Plaintiff asserts that the Defendants' denial of a periodic placement hearings, guaranteed access to television, and unrestricted canteen purchasing while housed in the SAU violated his rights under governing DOC regulations. The Court does not agree.
            The regulations upon which Plaintiff relies for his claimed rights are creatures of the administrative authority conferred on the DOC by the CJRA. Once again, therefore, these regulations are expressly limited in their application to prisoners in Restrictive Housing. See 103 Code Mass. Regs. § 423.00, et seq. Inasmuch as Leo's placement in MCI-Concord's SAU did not qualify as Restrictive Housing, the cited regulations invest Plaintiff with no enforceable
 
--------------------------------------------
 
[5] Plaintiff repeatedly fulminates that the DOC's implementation of the SAU, certain features of which are similar to but fall short of qualifying as Restrictive Housing, represents a deliberate attempt to "side-step" or "end run" the requirements of the CJRA. This argument is of no moment. If the DOC provided Leo with prison housing that complied with the provisions of the statute as written, its motives in seeking to toe closely to the legal lines so drawn (by imposing on prisoners the most controlled terms of confinement the law allows) will not be second-guessed in litigation. It will be for the Legislature, and not Leo or this Court, to redraw those lines as and to the extent it deems appropriate.
 
                                                            -8-
 
rights as a matter of law. See 103 Code Mass. Regs. § 423.09(4)(c) ("Within 90 days of an inmate's initial placement in Restrictive Housing and within every 90 days thereafter, the inmate shall be reviewed" to assess "the need for the inmate's continued placement in Restrictive Housing."); I 03 Code Mass. Regs. § 423. B(h) ("Inmates in Restrictive Housing shall be provided with ... access to either a radio or television, the choice of which will be in the Department's sole discretion, if confinement exceeds 30 days"); 103 Code Mass. Regs. § 423.B(k) ("Inmates in Restrictive Housing shall be provided with ...  access to canteen purchases ... however, such access ... may be diminished for the enforcement of discipline for a period not to exceed 15 days for each offense or where inconsistent with the security of the unit."). See Gaskins, supra at *4-6.
            For this reason, the Defendants' Motion for Summary Judgment shall be allowed as to all claims in the Complaint asserting violations of DOC regulations.[6]
            C. CONSTITUTIONAL CLAIMS
            In Counts 1-10 and 12-51 of the Complaint, Plaintiff asserts that the Defendants' placement of him in unregulated SAU housing, and their failure thereafter to afford him the periodic placement reviews provided for in LaChance, 463 Mass. 767, violated his constitutional rights to liberty and due process. Plaintiff claims that he is thus entitled to declaratory / injunctive relief and to money damages. The Court does not agree. Plaintiffs requests for equitable relief are moot, and his claims for money damages are barred by the doctrine of qualified immunity.
 
--------------------------------------------
 
[6] Counts 11-12, 22-23, and 32-33 of the Complaint conversely allege that Defendants violated G.L. c. 124 and the federal and state Constitutions by operating the SAU without lawfully promulgated regulations. Plaintiff has not specifically developed these arguments nor explained how Defendants violated the statutory or constitutional provisions cited. The DOC regulations in fact explicitly provide for the establishment and operation of the SAU, see 103 Code Mass. Regs.§§ 423.00 fil seq.. 430.00 fil seq. Defendants are entitled to summary judgment on these counts.
 
                                                            -9-
 
                        1. INJUNCTIVE RELIEF
            "Litigation is considered moot when the party who claimed to be aggrieved ceases to have a personal stake in its outcome" - that is, "where a court can order no further effective relief." Troila v. Department of Corr., 490 Mass. 1013, 1014 (2022), quoting Lynn v. Murrell, 489 Mass. 579,582 (2022). In the case at bar, Plaintiff is no longer confined at MCI-Concord, and the entire institution itself is in fact closed. Plaintiffs claims for equitable relief are thus moot, as such an order "would have no practical impact on [his] rights and would not redress in any way the injury he originally asserted." Ford v. Bender, 768 F.3d 15, 29 (1st Cir. 2014). Accord Pidge v. Superintendent, Mass. Corr. Inst., Cedar Junction, 32 Mass. App. Ct. 14, 19-20 (1992) (claim for declaratory relief held moot after plaintiff released to general population).
            Further, this is not a class action, cf. Cantell v. Commissioner of Corr., 475 Mass. 745, 754 (2016), and there is no reason to believe that similar cases will arise in the future but evade review. See Harmon v. Commissioner of Corr., 487 Mass. 470,472 (2021). Notably, it appears that current DOC policy requires status review hearing for all SAU inmates at least every 90 days. See 103 DOC§ 428.08.
            Plaintiffs claims for declaratory relief fail for substantially similar reasons. Under G.L. c. 23lA, § 1, declaratory relief "is reserved for real controversies and is not a vehicle for resolving abstract, hypothetical, or otherwise moot questions." Libertarian Ass'n of Mass. v. Secretary of Com., 462 Mass. 538, 547 (2012). Inasmuch as the record demonstrates that Leo's placement in the SAU did not entitle him to the CJRA protections accorded those in restrictive housing, and because both the substantive restrictions that Plaintiff challenges and the MCI facility that imposed them no longer exist, there is no live controversy appropriate for resolution via declaratory relief. Libertarian, supra.
 
                                                            -10-
 
            Defendants are thus entitled to summary judgment as to Plaintiff's requests for injunctive and declaratory relief.
                        2. DAMAGES
            As a threshold matter, although Plaintiff has attempted to assert claims for damages directly under the U.S. Constitution and the Massachusetts Declaration of Rights, the law does not recognize any such causes of action. See Doe, Sex Offender Registry Bd. No. 474362 v. Sex Offender Registry Bd., 94 Mass. App. Ct. 52, 57, 64 (2018). Rather, claims for damages against government officials are only available to the extent a statute has abrogated sovereign immunity. Id. at 57, 64, citing Irwin v. Commonwealth, 465 Mass. 834, 840-41 (2013); Sullivan v. Chief Justice for Admin. & Mgt. of the Trial Court, 448 Mass. 15, 31 (2006). Deprivations of federal rights are remedied under 42 U.S.C. § 1983, and damages are only available where the defendant violated "clearly established constitutional rights." Doe No. 474362, 94 Mass. App. Ct. at 57, 59, citing Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982); LaChance, 463 Mass. at 777. By the same token, a plaintiff may only obtain damages for deprivations of state constitutional rights pursuant to the Massachusetts Civil Rights Act, where the defendant must have acted through "threats, intimidation or coercion." Doe, No. 474362, 94 Mass. App. Ct. at 65, citing G. L. c. 12, §§ llH, I II. Thus, to survive summary judgment, Plaintiff must first present sufficient evidence of a due process violation specifically, that his incarceration in the SAU implicated a protected liberty or property interest, and that the DOC's procedures in connection with same were constitutionally inadequate. LaChance, 463 Mass. at 773; rm v. Spencer, 94 F.4th 136, 146-47 (1st Cir. 2024) (en bane). Second, Plaintiff must demonstrate that Defendants are not entitled to qualified immunity. See LaChance, 463 Mass. at 773, 777; G.L. c. 12, §§ llH, I II. "The upshot • of the[] differences between Federal and State law is that each of [P]laintiffs' claims must be
 
                                                            -11-
 
separately analyzed, paying attention not only to the substantive law but also ... to the applicable defenses and government immunities." Doe, No. 474362, 94 Mass. App. Ct. at 57.
                                    a. UNITED STATES CONSTITUTION
            To establish a deprivation of procedural due process under the Fourteenth Amendment, a plaintiff must demonstrate that he was deprived of a cognizable liberty or property interest without adequate notice or opportunity to be heard. Mathews v. Eldridge, 424 U.S. 319,333 (1976).
            "The Constitution does not mandate comfortable prisons," Farmer v. Brennan, 511 U.S. 
825,832 (1994) (internal quotation omitted), and prison officials are "afforded considerable leeway in dealing with prisoners, and in determining and administering the conditions of confinement." Lacy v. Coughlin, 100 Mass. App. Ct. 321,326 (2021), citing Farmer, 511 U.S. at 844-45. See Deal v. Commissioner of Corr., 475 Mass. 307,320 (2016) ("Generally speaking, ... the commissioner or her designee [has] broad discretion to classify inmates."). As such, the mere transfer of "an inmate ... from one situation to a significantly harsher one that is, nonetheless, a commonplace aspect of prison existence" does not implicate a protected liberty interest. Dominique v. Weld, 73 F.3d 1156, 1160 (1st Cir. 1996) (transfer from work release to medium security facility did not trigger liberty interest). See Jordan v. Federal Bureau of Prisons, 191 F. App'x 639,653 (10th Cir. 2006) ("[T]ransfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence" [quotation omitted]). Accord Hastings v. Commissioner of Corr., 424 Mass. 46, 51-52 (1997) (transfer from pre-release facility to higher-security institution not an "atypical hardship" of incarceration).
            Even when an inmate is placed in segregated confinement, a liberty interest is not
 
                                                            -12-
 
implicated unless the conditions thereby "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." LaChance, 463 Mass. at 773-74 (emphasis added), quoting Sandin v. Conner, 515 U.S. 472,484 (1995). Otherwise stated, an unconstitutional privation requires that the conditions of incarceration "work a major disruption in [the inmate's] environment," or a "'dramatic departure from the basic conditions' of the imnates's sentence." Perry, 94 F.4th at 148 (alterations in original), quoting Sandin, 515 U.S. at 485, 486. "Ordinary incidents of prison life" are what inmates in the relevant prison system (Massachusetts) would reasonably or normally  expect  based  on the system's  own actions, practices and policies. Perry, 94 F.4th at 150-151, citing Sandin,  515 U.S. at 484,486 n.9. As such, a state's laws and regulations, "while not the source of any liberty interest themselves," are relevant in determining an inmate's reasonable expectations. Perry, 94 F.4th at 155.
            Whether a hardship exists depends upon "both the degree and the duration of restrictive confinement." LaChance, 463 Mass. at 774, citing Sandin, 515 U.S. at 486. The particular circumstances in which courts have found a protected liberty interest, however, have been limited to lengthy incarcerations in conditions equivalent to solitary confinement. See, , Wilkinson v. Austin, 545 U.S. 209, 223-24 (2005) (indefinite placement in "supermax" prison with "severe limitations on all human contact" akin "to most solitary confinement facilities" was found to be "an atypical  and significant  hardship" under "any plausible baseline"); Perry, 94 F.4th at 144 (liberty interest implicated where plaintiff spent 600 days in pre-CJRA segregation "akin to solitary confinement"). Depending upon the reason for segregation and the reasonable expectations of an inmate population, "segregated confinement (even when it amounts to solitary confinement) may in some circumstances be an 'ordinary incident of prison life."' Perry:, 94 F.4th at 151 (emphasis in original, quotation omitted). See Sandin, 515 U.S. at 486 (1995) (30
 
                                                            -13-
 
days of solitary confinement not a major disruption triggering due process protection); Skinner v.
Cunningham, 430 F.3d 483,485 (1st Cir. 2005) (solitary confinement for 40 days without hearing not excessive where inmate under investigation for murder); Jones v. Baker, 155 F.3d 810, 812-13 (6th Cir. 1998) (two-and-a-half years of solitary confinement without hearing permissible after plaintiff implicated in killing of guard during prison riot).[7]
            In LaChance, the SJC confronted a case in which a prisoner had been transferred from general population ("J-1") housing to an "administrative segregation" unit pending the resolution of prison disciplinary proceedings against him. 463 Mass. at 769. Residents of J-1 were allowed to spend almost five hours outside of their cells each day (including recreation in a variety of indoor and outdoor facilities); to have three weekly "contact" visits with outside parties, each lasting up to two and one-half hours; opportunities to visit the prison library; to spend up to fifty dollars per week in the canteen; and access to a broad range of educational, religious, and other programs. Id. at 771. The plaintiffs segregated confinement, by contrast, was "substantially more restrictive." Id. He was detained in administrative segregation for ten months, during which he experienced conditions of confinement bearing all the attributes of pre-CJRA restrictive housing. Id. He was confined to his cell 23 hours per day; was shackled in his wrists and ankles when not in his cell; could only request two library books per week (rather than enjoy the library privileges accorded to other prisoners); had very limited canteen purchasing rights; and was denied participation in any of the educational, religious, vocational and rehabilitative programs available to inmates in the general prison population. Id. The SJC held that inmates who were
 
--------------------------------------------
 
[7] Compare with Harris v. Caruso, 465 F. App'x 481,484 (6th Cir. 2012) (eight years of administrative segregation held atypical and significant hardship); Shoats v. Horn, 213 F.3d 140, 143-44 (3d Cir. WOO) (eight years of administrative segregation exceeded experience of99% of prison's population and triggered liberty interest); Colon v. Howard, 215 F.3d 227,231 (2d Cir. 2000) (305 of 360-day sentence in solitary confinement required hearing); Lee v. Coughlin, 26 F. Supp. 2d 615, 635 (S.D.N.Y. 1998) (376 days of confinement exceeded that of 99% of general inmates sentenced to segregated detention).
 
                                                            -14-
 
segregated in such "severe conditions" for ninety days or longer were entitled to due process protections - viz., notice of the basis for confinement, a hearing to contest its rationale and justification, and a written explanation of the reviewing authority's decision. Id. at 776-77. 
            In the present action, Plaintiff seeks to extend the constitutional principles and rules announced in LaChance to the circumstances of his SAU confinement at MCI-Concord. Although the DOC defined the SAU as "a short-term treatment program," Plaintiff was incarcerated there for 219 days, well beyond the threshold established in LaChance. The record is silent as to why the investigation and adjudication of a non-violent drug offense warranted a seven-month term in the unit. The SAU Rules provided only vague, discretionary standards for the duration of any inmate's confinement. See SOF, Exs. A, p. 3; A-1, § 2(b) ("The length of time you will be housed in the SAU varies depending on your behavior and program engagement. Your willingness to participate in a positive manner will determine when you are moved to a general population."). To be sure, the prospect of DOC removing an inmate from the general prison population and holding him for seven months while it resolves a non-violent disciplinary offense is troubling to the Court, and raises some level of due process concern. See LaChance, 463 Mass. at 776 (noting that confinement was indefinite and wholly dependent on official's subjective and unreviewable discretion).[8] That much acknowledged, however, the Court has no hesitation concluding that the conditions of Plaintiff's confinement in the SAU materially distinguish this case from LaChance and other relevant precedent.
            Strikingly, no court, at least in the thirty years since the Supreme Court's decision in Sandin, supra, has recognized a protected liberty interest outside the context of solitary confinement, of which the SAU indisputably was not. See Wilkinson, 545 U.S. at 210-11 (almost
 
--------------------------------------------
 
[8] Assuming arguendo that a protected liberty interest exists, Lachance seemingly forecloses any claim by DOC that its grievance procedures were constitutionally adequate. See LaChance, 463 Mass. at 776; - Perry94 F.4th at 161-62.
 
                                                            -15-
 
all human contact prohibited, inmate may exercise one hour per day in a small indoor room; and placement disqualifies an otherwise eligible inmate from parole consideration); , 94 F.4th at 144 ("akin to solitary confinement," inmate confined to windowless cell except for solitary exercise one hour per day, five days per week); Shoats, 213 F.3d at 144 (inmate held 23 to 24 hours per day in cell with no contact beyond corrections officials); Colon, 215 F.3d at 230 (2d Cir. 2000) (inmate confined in cell 23 hours per day; allowed to exercise in prison yard for one hour per day; permitted to take two showers per week; and denied all out-of-cell work and schooling); Lee, 26 F. Supp. 2d at 626 (confined to cell 23 hours per day). See also Haverty, 437 Mass. at 753-54, 757 (confined to cell 23 hours per day, "extremely limited, if any, opportunities for educational, occupational, recreational, or social activities, and little opportunity to interact with or observe the outside world or to maintain family contacts" . . . "in effect, solitary confinement").
            Here, by contrast, Leo was allowed a minimum of three hours of out-of-cell time every day, and four hours on two days each week. This included one hour for recreation in the yard, and one hour during which he could socialize with the other 19 inmates in the SAU and use the shower, telephone or television. Leo received regular one-on-one counseling, was permitted three non-contact visits per week, and was allowed to participate in a wide range of rehabilitative program offerings in group settings within the facility. Leo likewise enjoyed broad access to prison libraries. Indeed, Plaintiff here appears to have possessed virtually all of the rights and privileges the of J-1 housing approved in LaChance,[9] with the exception of modestly fewer hours outside the cell (three hours vs. five hours); reduced canteen privileges ($30 per week vs. $50 per
 
--------------------------------------------
 
[9] Neither party has produced substantial evidence of the conditions of the general population at MCI-Concord to establish a comparative baseline.
                                                            -16-
 
week); and non-contact as opposed to contact visits. Cf. Jordan, 191 F. App'x at 649 (10th Cir. 2006) (administrative custody with one less social call per month and one hour less recreation time per day was not significant departure from general population). Regardless of the DOC's motives in establishing the SAU,[10] therefore, Plaintiffs conditions there were plainly not commensurate with the drastically more severe conditions of solitary confinement that courts have found to depart from the ordinary incidents of prison life. See Perry, 94 F.4th at 148-53 (discussing cases).
            As the First Circuit observed in Perry last year, determining "when, if ever," "less onerous" forms of segregation (even when still constituting solitary confinement) implicate a liberty interest "is not an easy task, given the available precedent." Id. at 149. See Haverty, 437 Mass. at 754 ("The isolation of prisoners in segregated confinement, including for nondisciplinary purposes, has been the source of constant appellate litigation."); Skinner v. Cunningham, 430 F.3d 483, 486 (1st Cir. 2005) ("The hardship test has itself become the source of major disagreement."). Neither party has identified a case addressing conditions substantially similar to the SAU. The meager reported caselaw that does exist, however, suggests that inmates held in segregated settings that are less restrictive than solitary confinement are not entitled to additional due process protections. Cf. DiMarco v. Wyoming Dept. of Corr.. 473 F.3d 1334, 1344 (I 0th Cir. 2007) (administrative segregation from general population for 14 months did not raise liberty interest); Griffin v. Vaughn, 112 F.3d 703, 708 (3d Cir. 1997) (administrative custody for 15 months not atypical hardship).[11] As the available precedent is admittedly
 
--------------------------------------------
 
[10] Plaintiff alleges that DOC designed the SAU to skirt the requirements of the CJRA and Lachance that would otherwise apply to Restrictive Housing; whereas Defendants maintain that the SAU was conceived as a "highly structured" but substantially less restrictive treatment-based diversion from Restrictive Housing. See I03 Code Mass. Regs. § 430.05.
[11] Compounding the difficulty confronting the Court in its analysis is the failure of either party to provide evidence of the baseline expectations of inmates at MCI-Concord or the Massachusetts prison system generally as to the
 
                                                            -17-
 
distinguishable,[12] however, determining whether Plaintiff has presented a cognizable liberty interest and, if so, what kind of protective procedure was owed, would require this Court to wade into largely uncharted waters.[13] 1bis is wisely avoided, where settled principles of qualified immunity light a path to the same destination. Where, as here, the Court can "rather quickly and easily decide that there was no violation of [any] clearly established [right]," judicial restraint counsels against assaying "the more difficult question whether the facts make out a constitutional violation at all." Pearson v. Callahan, 555 U.S. 223, 239 (2009); ,ern, 94 F.4th at 170 (Lynch,
J., concurring). See ,ern, 94 F.4th at 146 (court may "bypass the first step if we conclude that the right was not clearly established at the time of its alleged violation").
"[A] right is only clearly established if, at the time of the alleged violation, the contours
... were sufficiently definite so that a reasonable official would appreciate that the conduct in
 
--------------------------------------------
 
likelihood and duration of incarceration in the SAU. Cf. Sandin, 515 U.S. at 486 ("[C]onfinement did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction ... [where] conditions ... involve[d] significant amounts of 'lockdown time' even for inmates in the general population.").
[12] Read in proper context, the reference in LaChance to "administrative segregation" plainly applies to solitary confinement and the "substantially similar" restrictions employed at the time. 463 Mass. at 772. See cases cited supra. See also Davis v. Ayala, 576 U.S. 257, 286-87 (2015) (Kennedy, J., concurring) (noting that segregation, in practice, often constitutes solitary confinement, e.g. incarceration "in a windowless cell no larger than a typical parking spot for 23 hours a day ... [with] little or no opportunity for ... interaction with anyone"). As the SJC explicitly held that the existence of a protected interest triggered by confinement is a question of"both the degree and duration," 463 Mass. at 774, the Court does not read LaChance to require a hearing any time an inmate is segregated from the general population for 90 days or more, even where (as here) those conditions are not substantially more restrictive than the general population. See    ,94 F.4th at 154 ("We do not identify a minimum length ... [at which] segregated confinement constitutes an 'atypical and significant hardship."').
[13] The Court is loath to issue a ruling that  could  be read  as removing  from  procedural  due process  protection  any form of administrative segregation that does not technically  rise to  the  level  of  Restrictive  Housing.  At  the same time, the Court is not convinced that Plaintiff  has  adequately  demonstrated  a constitutional violation.  Further,  to decide when and what procedures were owed, the Court would either need to ignore the material differences distinguishing this case (and hold that Plaintiff was entitled to a 90-day  Lachance  hearing),  or select  a different deadline arbitrarily -- something even the LaChance  court refused  to  do. See LaChance,  463  Mass.  at 776 (selecting 90 days based on regulations applicable to the departmental segregation unit, I03 DOC  § 422 (2008)).  The Court declines to hazard such adventures where they are unnecessary  to  a resolution  of this matter, and  would have no binding effect on future cases. See Pearson v. Callahan, 555 U.S. 223, 239 (2009) (appropriate to bypass question of constitutional right where defendants are entitled to qualified immunity);  Fitzpatrick  v.  Department  of  Corr.,  102 Mass. App. Ct. 617, 622 n. l O (2023) (Superior Court precedent "not binding" on future cases); Massachusetts ex rel. Powell v. Holmes, No. CV 18-11336-FDS,  2022  WL 2048706,  at *7 (D. Mass. June 7, 2022)  ("Superior  Court decision can only be persuasive, not precedential.").
 
                                                            -18-
 
question was unlawful." Barron v. Kolenda, 491 Mass. 408,424 (2023), quoting LaChance, 463 Mass. at 777 (internal quotation omitted). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law."' District of Columbia v. Wesby, 583 U.S. 48, 63 (2018), quoting Malley v. Briggs, 475 U.S. 335,341 (1986). Accord Gutierrez, 437 Mass. at 403 (2002) ("Qualified immunity shields law enforcement officials who reasonably but mistakenly believe that they are acting in accordance with constitutional mandates."). "A rule is clearly established either when it is 'dictated by controlling authority or a robust consensus of cases of persuasive authority."' Irish v. Fowler, 979 F.3d 65, 76 (1st Cir. 2020), quoting Wesby, 138 S. Ct. at 589-90.
            As set forth above, no controlling authority or "robust consensus" existed circa 2019-20 to establish with clarity that inmates in SAU-type confinement were entitled to a LaChance hearing or similar procedural safeguards. As noted ante, LaChance and Cantell, decided in 2012 and 2016 respectively, concerned DOC's placement of inmates in pre-CJRA segregation units, "essentially in conditions of solitary confinement." Cantell 475 Mass. at 750-51. The passage of the CJRA in 2018, and the DOC's attendant promulgation of implementing regulations thereafter, effectively codified LaChance and Cantell, and thereby defined the conditions of Restrictive Housing that entitled an inmate to 90-day hearings. See G.L. c. 127, § 1; 103 Code Mass. Regs. § 423.09(4)(c). The CJRA neither prohibited less restrictive forms of administrative segregation, nor mandated 90-day hearings for such units, reasonably indicating that the Legislature did not perceive such due process protections to be required outside the context of Restrictive Housing. See Commonwealth v. Montarvo, 486 Mass. 535,541 (2020) ("The Legislature is presumed to be aware of the prior state of the law as explicated by the decisions of this court."); Commonwealth v. Ballard, 92 Mass. App. Ct. 701, 705 (2018) ("There is every
 
                                                            -19-
 
presumption that the [Legislature] always intends to act strictly within the bounds of the Constitution."), quoting Commonwealth v. Welosky. 276 Mass. 398,406 (1931). The line drawn in the CJRA was (and remains) entirely consistent with state and federal precedents which, as noted ante, have not recognized a liberty interest beyond conditions that equate to solitary confinement. See supra. See also , 94 F.4th at 173 (Lynch, J. concurring) ("Massachusetts inmates in administrative segregation receive greater protection under [the CJRA] than is required by federal due process[.]"). As such, a corrections official in 2019-20, armed with knowledge of the CJRA and existing legal precedent, could reasonably conclude that an inmate incarcerated in the SAU as Leo was did not sacrifice a protected due process right. See Ashcroft, 563 U.S. at 743 ("Qualified immunity gives government officials breathing room to make reasonable [if even] mistaken judgments about open legal questions.").[14]
            Defendants are thus entitled to summary judgment on Plaintiffs claims that they violated his due process rights under the Fourteenth Amendment of the U.S. Constitution.
                                    b. MASSACHUSETTS DECLARATION OF RIGHTS
            As discussed ante, the analysis of Plaintiffs damages claims for violation of his state constitutional rights echoes the analysis applicable to his federal constitutional claims. Plaintiff must again demonstrate that that he was deprived of a protected right (this time, under the Massachusetts Declaration of Rights), and that the Defendants are not entitled to qualified immunity. Doe No. 474362, 94 Mass. App. Ct. at 57. See also Drayton v. Commissioner of
 
--------------------------------------------
 
[14] Reinforcing the Court's conclusion is the fact that many of the denied privileges upon which Plaintiff rests his claim in this case - viz., restricted television viewing, canteen purchasing, and vocational programming - had previously been held by our appellate courts not to implicate a constitutionally protected liberty interest. See, U, Murphy v. Cruz, 52 Mass. App. Ct. 314, 319 (2001) ("The plaintiffs temporary loss of canteen privileges and attendance at the residents council's meeting are at most losses of privileges that do not give rise to a liberty interest"); Sabree v. Superintendent, Mass. Corr. Inst., 2001 WL 1014545 at *2 (Mass. App. Ct.) (Rulel:28 Dec.) (""[P]risoners do not have a constitutional right to watch television or to listen to the radio"); McKune v. Lile, 536 U.S. 24, 39 (2002) (loss of"access to vocational, educational, recreational, and rehabilitative programs" occasioned by transfer to another prison did not implicate a liberty interest).
 
                                                            -20-
 
Corr., 52 Mass. App. Ct. 135, 138 (2001) ("An inmate is entitled to the protection of procedural due process under the Federal and State Constitutions only if there is an existing liberty or property interest at stake"). Because the two Constitutions are not identical, and Massachusetts law imposes a distinctive standard to overcome qualified immunity, a separate analysis of Plaintiffs state constitution-based claims for damages is required. Id. ("differences between Federal and State law" requires that plaintiffs' damage claims for deprivation of due process be "separately analyzed"). The result, however, is the same - the Defendants are immune.
            Our appellate courts have not explicitly decided, in this context, whether art. 12 of the Massachusetts Declaration of Rights is coextensive with or provides greater due process protections than the Fourteenth Amendment. Cantell, 475 Mass. at 755. Regardless, however, as with Plaintiffs federal claims, the Court need not decide this constitutional question because it is apparent that Defendants are entitled to qualified immunity. See Appleton v. Hudson, 397 Mass. 812,817 (1986), abrogated on other grounds by Jean W. v. Commonwealth, 414 Mass. 496 (1993). Accord Wright v. Turco, 105 Mass. App. Ct. 1105, 2024 WL 4902048, *5 (Nov. 27, 2024) (Rule 23.0).
            The Commonwealth and its officers are immune from suits for damages for actions taken as state officers, except to the extent the Legislature has explicitly waived such immunity. Doe No. 474362, 94 Mass. App. Ct. at 64-65, citing Irwin, 465 Mass. at 840-841 ("Where the Commonwealth does choose to waive its sovereign immunity, it can be sued 'only in the manner and to the extent expressed [by the] statute"' [citation omitted]); Sullivan, 448 Mass. at 31 ("[T]he Commonwealth cannot be sued unless there has been a waiver of its sovereign immunity"). The Massachusetts Civil Rights Act ("MCRA") partially abrogates sovereign immunity, and permits damages claims for deprivations of constitutional rights, but only upon
 
                                                            -21-
 
proof that the defendants interfered (or attempted to interfere) with a clearly established state right through "threats, intimidation, or coercion." Barron, 491 Mass. at 423; Doe No. 474362, 94 Mass. App. Ct. at 65; G. L. c. 12, §§ llH-1lI.
            As noted ante, inmates housed in the SAU circa 2019-20 did not have a clearly established right to LaChance-type hearings under art. 12 of the Declaration of Rights. Cantell, 475 Mass. at 755. Further, even if such a right had been clearly established, nothing in the record suggests that the Defendants interfered with such a right through "threats, intimidation or coercion," as required to support a damages claim under the MCRA.[15] Plaintiff repeatedly impugns the DOC's motives in establishing the SAU, without evidence to support such claims. But even if Plaintiff had proven that the Defendants created the SAU to evade the strictures of the CJRA, this would not remotely approach interference with a state constitutional right via threats, intimidation, or coercion. See LaChance, 463 Mass. at 778 (holding defendants entitled to qualified immunity under MCRA).
            Accordingly, the Defendants are entitled to judgment as a matter of law on Plaintiff's claims for violations of the Massachusetts Declaration of Rights.
CONCLUSION AND ORDER
            For all the foregoing reasons, the Defendants' Motion for Summary Judgment shall be, and hereby is, ALLOWED.
 
--------------------------------------------
 
[15] A "threat" requires "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm[,] ... '[i]ntimidation' involves putting in fear for the purpose of compelling or deterring conduct[,]" and, lastly, "coercion" is defined as "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done" (internal quotations and citations omitted). Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474 (1994).
 
                                                            -22-
 
SO ORDERED.
/s/Robert B. Gordon
Justice of the Superior Court
February 19, 2025